**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **SOUTHERN TRUST METALS, INC.,** | ) |
| **LORELEY OVERSEAS CORPORATION,** | ) |
| **and ROBERT ESCOBIO,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**COMPLAINT FOR INJUNCTIVE AND EQUITABLE RELIEF AND PENALTIES**
**UNDER THE COMMODITY EXCHANGE ACT**

Plaintiff U.S. Commodity Futures Trading Commission ("Commission" or "CFTC")

alleges as follows:

## I.    SUMMARY

1.    From at least July 16, 2011 to May 1, 2013, Southern Trust Metals, Inc. ("ST

Metals") and Loreley Overseas Corporation ("Loreley"), by and through their officers,

employees, and agents, including Robert Escobio (collectively "Defendants"), operated a scheme

in which Defendants defrauded retail customers in connection with illegal, off-exchange,

financed precious metals transactions.  Defendants received more than $2.6 million from at least

135 customers who collectively lost at least $600,000 in connection with this scheme.

2.    In addition to and separate from Defendants' off-exchange metals scheme,

between February 2011 and May 2013, Defendants solicited and accepted orders for the

purchase or sale of commodities for future delivery and commodity options on or subject to the

rules of a contract market without registering with the Commission as a futures commission merchant ("FCM").  Defendants unlawfully received more than $900,000 from customers for futures and options trading.

3.      By virtue of this conduct and the conduct further described herein, Defendants have engaged in conduct in violation of Sections 4(a), 4b(a)(2)(A), (B), and (C), 4d, and 6(c) of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 6(a), 6b(a)(2)(A), (B), and (C), 6d, and 9 (2012), and Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2013).

4.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices.

5.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful practices and to compel their compliance with the Act and the regulations promulgated thereunder.  In addition, the CFTC seeks restitution, rescission, disgorgement, civil monetary penalties, and such other equitable relief as this Court may deem appropriate.

## II.      JURISDICTION AND VENUE

6.      Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

7.      The Commission has jurisdiction over the conduct and transactions at issue in this case pursuant to Sections 2(a)(1)(A), 2(c)(2)(D) and 6(c) of the Act, 7 U.S.C. §§ 2(a)(1)(A), 2(c)(2)(D), and 9.

8.      Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants reside or transact business in this District and certain transactions, acts, practices, and business alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

### III.      PARTIES

9.      Plaintiff **United States Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with administering and enforcing the Act and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.*

10.     Defendant **Robert Escobio** ("Escobio") is a resident of Coral Gables, Florida. Escobio is the majority owner of Defendants **Southern Trust Metals, Inc.** ("ST Metals") and **Loreley Overseas Corp.** ("Loreley") through his and his wife's collective ownership of shares in a related entity named Southern Trust Securities Holding Corp. ("STS Holding").

11.     **ST Metals** is a wholly-owned subsidiary of STS Holding with its principal place of business at 145 Almeria Avenue, Suite 100, Coral Gables, Florida.  Escobio incorporated ST Metals in Florida in 2009 and was identified as a Director of ST Metals in its corporate filings with the State of Florida between 2009 and 2012.  Escobio at all times has controlled ST Metals and was its principal decision-maker during the relevant time period.  ST Metals has never been registered with the Commission in any capacity.

12.     **Loreley** is a British Virgin Islands company that Escobio incorporated in 2004. Loreley, like ST Metals, is a wholly-owned subsidiary of STS Holding.  Escobio directed and controlled the operations of Loreley during the relevant time period.  Loreley had a registered office in the British Virgin Islands at the Office of Aramo Trust Co. Limited, P.O. Box 3099,

Road Town Tortola, but its business activities were run by Escobio from the ST Metals office in Coral Gables, Florida.  Loreley has never been registered with the Commission in any capacity.

13.    During the relevant period Escobio was registered with the Commission as an Associated Person of Southern Trust Securities, Inc. ("ST Securities"), another subsidiary of STS Holding controlled by Escobio.

14.    Escobio was the subject of an Associate Responsibility Action ("ARA") that the National Futures Association ("NFA") issued on May 1, 2013 in connection with Escobio's role with ST Metals and its acting as an unregistered FCM.  Escobio also was the subject of a NFA Business Conduct Complaint filed on August 29, 2013 relating to the same conduct.  On April 8, 2014, pursuant to an offer of settlement submitted by Escobio, an NFA panel found that Escobio violated a NFA compliance rule by indirectly operating ST Metals which accepted funds from customers that were used to trade futures on a U.S. futures exchange without ST Metals being registered as a FCM.

## IV.    STATUTORY BACKGROUND

15.    Section 2(a)(1)(A) of the Act, 7 U.S.C. § 2(a)(1)(A) provides that the CFTC shall have exclusive jurisdiction, with limited exceptions, with respect to "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an option) . . . or contracts of sale of a commodity for future delivery . . . . traded or executed on a contract market designated pursuant to section 5 or . . . any other board of trade, exchange, or market."  7 U.S.C. § 2(a)(1)(A).

16.    Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D), applies to "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a non-eligible contract participant ("ECP") "on a leveraged or margined basis, or financed by the offeror, the

counterparty, or a person acting in concert with the offeror or counterparty on a similar basis," with respect to conduct occurring on or after July 16, 2011, subject to certain exceptions not applicable here ("retail commodity transactions"). Such retail commodity transactions are subject to Sections 4(a), 4(b), and 4b of the Act, 7 U.S.C. §§ 6(a), 6(b), 6b, "as if" they are a contract of sale of a commodity for future delivery. 7 U.S.C. § 2(c)(2)(D)(iii).

17. The Act defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual. 7 U.S.C. § 1a(18)(xi).

18. Section 4(a) of the Act, 7 U.S.C. § 6(a), in relevant part, makes it unlawful for any person to offer to enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery unless the transaction is conducted on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

19. Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2), in relevant part, makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for, on behalf of, or with any other person, other than on or subject to the rules of a designated contract market: (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement, or willfully to enter or cause to be entered for the other person any false record; or (C) willfully to deceive or attempt to

deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for, on behalf of, or with the other person.

20.      Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), makes it unlawful for any person to be a FCM unless such person is registered with the Commission.  The Act defines FCM to include an entity that is engaged in soliciting or accepting orders for, among other things, the purchase or sale of a commodity for future delivery, any commodity option authorized under section 4c, or any retail commodity transaction.  The Act further defines FCM to include any entity that acts as a counterparty in any retail commodity transaction.  7 U.S.C. § 1a(28)(A)(i)(I)(aa)(DD) and (bb).

21.      Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person to use or employ, or attempt to use or employ, in connection with a contract of sale of any commodity in interstate commerce, any manipulative or deceptive device or contrivance, in contravention of Commission rules or regulations.  Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a), in relevant part, makes it unlawful for any person, in connection with a contract of sale of any commodity in interstate commerce, to intentionally or recklessly: use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; make or attempt to make any untrue or misleading statement of material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or engage or attempt to engage in any conduct that operates or would operate as a fraud or deceit upon any person.

## V.   FACTS

### A.  Defendants' Financed Metals Transactions

22.     Escobio held ST Metals out as a precious metals trading firm offering financing to purchase physical precious metals including gold, silver, platinum and palladium.

23.     ST Metals generally solicited customers for its financed precious metals transactions by telephone.  Its sales representatives solicited new customers to open accounts with ST Metals, and accepted orders from customers for transactions after those accounts were opened.

24.     Through telephone solicitation, sales and marketing materials, its website, and customer agreements, ST Metals represented that its customers were purchasing, and that ST Metals was selling, physical precious metals.  ST Metals offered two types of physical metals transactions: (1) fully paid transactions; and (2) financed or "leveraged" transactions.  The fully paid transactions are not at issue in this Complaint.

25.     In promotional materials, ST Metals offered "leveraged bullion and precious metals investing."  It claimed that "leveraged bullion can be purchased in the same manner as cash.  You simply buy more."  ST Metals analogized its leveraged metals investment to the purchase of a home with a loan secured by a mortgage, and told customers that their metals "holdings" would be stored in a secure depository.

26.     ST Metals advertised that in its financing program the customer only needed to pay a percentage of the total value of the metal purportedly being purchased.  ST Metals represented that it would loan the customer the remaining funds, and that ST Metals would charge interest on this loan.  ST Metals represented that the customer would then buy, and ST Metals would sell, the total quantity of physical metal.  ST Metals represented that the total quantity of physical metal would be held for the customer at a depository.

27.     After opening an account and depositing funds with ST Metals, retail customers would place buy or sell trades.  ST Metals generally accepted orders for trades by telephone.

28.     Retail customers typically began trading with equity in their trading account equal to 20% of the total value of the metals being bought or sold.  ST Metals charged customers a commission and a price spread on their metals trades.  ST Metals also charged customers interest on its purported loans.

29.     The value of retail customer accounts would fluctuate in part based on the price movement of the metals in their accounts.  The interest on the purported loans made by ST Metals directly decreased the customer's equity.  When a customer's account equity fell below a certain equity level, usually 15%, ST Metals would send the customer a margin call that required the customer to deposit additional funds in order to maintain the position.  If the customer's equity dropped lower, usually 9%, any open positions were liquidated to bring the dollar value of the trading account's equity back above 15%.

**B.  ST Metals Did Not Purchase, Store or Deliver Physical Metals In Its Financed Metals Transactions**

30.     In reality, ST Metals never possessed any precious metal, never held title to any precious metal, and never delivered any precious metal in connection with its financed metals transactions.

31.     Instead, ST Metals engaged in a series of transactions that ended with over-the-counter ("OTC") derivative trades in margin trading accounts in the name of Loreley with either of two foreign trading firms, Hantec Markets Limited ("Hantec") and Berkeley Futures Limited ("Berkeley").  With respect to the metals scheme, Escobio used the Hantec and Berkeley trading accounts to cover the exposure of ST Metals to its customers trading positions.

32.     Escobio opened the margin trading account with Hantec in November 2010 in the name of Loreley, and began placing trades in the account in January 2011.  Escobio opened the margin trading account with Berkeley in August 2010 in the name of Loreley, and began placing trades in the account in September 2011.

33.     Loreley had three directors, none of whom had any role in the day-to-day operation of Loreley.  That was left to Escobio, who according to several company resolutions, was given authority to act on behalf of Loreley in all critical respects.  For example, on October 26, 2009, Loreley's board of directors signed a resolution stating that the company "directs and authorizes Robert Escobio to open Brokerage and Bank accounts and enter orders for equities, futures, precious metals, options and fixed-income securities.  Loreley Overseas Corporation also grants Authority and Power of Attorney to Robert Escobio to act on behalf of Southern Trust Metals, Inc."

34.     On July 26, 2010, the directors of Loreley signed a resolution that "directs and authorizes Robert Escobio to open an account at Berkeley Futures Limited" and which "grants Authority and Power of Attorney to Robert Escobio to act on behalf of Southern Trust Metals, Inc. and Loreley Overseas Corporation."

35.     Escobio was identified as the "Authorized Representative" of Loreley for the Hantec trading account and the "Attorney in Power" for the Berkeley trading account.  Escobio also signed a guarantee of Loreley's obligations with respect to one of the trading accounts on behalf of STS Holding Corp.

36.     The funds used to trade OTC metals derivatives at Hantec and Berkeley took a circuitous route.  After ST Metals received money from customers in its bank account, Escobio, or someone authorized by Escobio, transferred the funds to a Loreley bank account.  Then

Escobio, or someone at his direction, wired the funds from this Loreley bank account to either Hantec or Berkeley, or their respective affiliates, Hantec Markets (Australia) Pty Ltd. and Berkeley (Bahamas) Limited. Escobio was a signatory on, and controlled, the bank accounts of both ST Metals and Loreley.

37.     Escobio set up "master accounts" at Hantec and Berkeley in the name of Loreley, and then "sub-accounts" loosely corresponding to ST Metals customers under the umbrella of these master accounts.

38.     Once funds had been transferred to Hantec or Berkeley, ST Metals instructed Hantec and Berkeley how to allocate the funds between the sub-accounts. Then, ST Metals placed trades in these sub-accounts using the online platform and software provided by Hantec, or by phone with Berkeley.

39.     Hantec is not a physical metals dealer or depository. It did not sell physical metals for storage or delivery to Loreley or ST Metals. Hantec did not make cash loans to Loreley or ST Metals for the purchase of physical metals.

40.     Hantec is primarily a foreign currency exchange ("forex") dealer for non-U.S. based retail investors. Hantec's standard "Product Guide" (also called a "Product Disclosure"), available on the Hantec website and applicable to Hantec trading accounts, specifically states:

    a.   "*We do not deliver the physical underlying assets . . . and you have no legal right to it. Rather, settlement is made by cash based on the difference between the buy and sell rates of the Contracts.*"

    b.   "*The Contract derives its value from an asset . . . which is never delivered to you, and you do not have a legal right to, or ownership of the asset. Rather, your rights are attached to the Contract itself.*"

41.     Similarly, Berkeley is not a physical metals dealer or depository.  It did not sell physical metals for storage or delivery to Loreley or ST Metals.  Berkeley did not make cash loans to Loreley or ST Metals for the purchase of physical metals.  The Corporate Account application for the Loreley trading account at Berkeley included an acknowledgement that:

a.     "*We understand, unless you specify otherwise, that you wish to speculate in derivative products which involves a high level of risk and that your investment horizon for individual transactions is short-term (less than 3 months).*"

42.     ST Metals and Loreley traded OTC contracts which tracked the value of the underlying commodities being traded (gold, silver, platinum or palladium).  But the trading did not involve the purchase, sale, transfer or delivery of the actual underlying commodities.  These were margin trading accounts, meaning that ST Metals and Loreley deposited funds used as "margin" for trading in the account, and Hantec or Berkeley took the opposite side of the trades.  The trading account was subject to "margin calls" if the ST Metals and Loreley failed to keep sufficient funds in its trading account to support its trading positions.

43.     Between July 2011 and May 2013, ST Metals and Loreley placed thousands of trades in their Hantec and Berkeley margin trading accounts.  None of these trades were conducted on a regulated exchange.  None of these trades involved the sale, transfer or actual delivery of physical metals.

**C.  Defendants' Material Omissions, Misrepresentations and Deception Regarding the Financed Metals Transactions**

44.     ST Metals told customers that they were buying and selling physical metals with a loan from ST Metals.  This was not true.  ST Metals used customer funds to place trades in margin trading accounts.  These trades did not involve the purchase, sale, transfer or delivery of physical metals, or loans to purchase physical metals.

11

45.     ST Metals' website, promotional materials, account statements and account documentation supported this deception.  For example, among the "Reasons for Owning Precious Metals" touted in ST Metals promotional materials was that "Our leveraged approach to bullion investing can be a powerful tool during periods of rapidly changing precious metals prices."  ST Metals' promotional materials also informed customers they would have metals "holdings" and explained why customers should keep their "metals on deposit."

46.     ST Metals' account opening documents referenced "the ownership of physical precious metals" and the "delivery of the metals" in connection with the financed transactions. These documents also discussed financing, stating that "Most recognized depositories also provide financing services, which allow clients to borrow up to 80% of the value of their precious metals products, which are also in the non-segregated depository facilities of the lending institutions."  These references to physical metals, delivery and depository facilities were designed to give customers the impression that they were buying physical metals.

47.     ST Metals generated trade confirmations following trades and issued periodic account statements.  ST Metals also provided web-based access to customers to allow them to view these account statements and trade confirmations.  These trade confirmations and account statements made it appear that customers were buying and selling physical metals with loans provided by ST Metals.  ST Metals never disbursed any loans to the customer.  ST Metals charged the customer interest even though no loan was ever made to the customer.

48.     The account statements generated by ST Metals contained a "Quantity" field, which showed the total quantity of metal for the transactions.  The statement also listed the "Loan Amount," which showed the loan balance and an "Accrued Interest" field which reflected the monthly finance charged to the account.  Trade confirmations similarly contained a

"Quantity" field reflecting the number of ounces of the metal purportedly being purchased or sold in a given transaction, along with the type of metal and price for the trade.

49.      ST Metals did not disclose the involvement of Loreley in any transactions.  ST Metals did not reference Hantec or Berkeley.  ST Metals did not disclose that it was simply trading metals derivatives that did not involve the sale, transfer, delivery or storage of a physical product.  ST Metals failed to disclose the credit and counterparty risk it was exposing customers to through its multi-tiered off-exchange metals scheme.

50.      ST Metals never had possession, ownership, title or any interest in any physical metals, and could not make delivery of any physical metals.  ST Metals could not and did not actually transfer, allocate, or sell any precious metal to the customer.

**D.  ST Metals Illegally Accepted Orders For Exchange Traded Futures**

51.      Separate from and in addition to the illegal, off-exchange financed metals trading scheme conducted by ST Metals through the margin accounts at Hantec and Berkeley, ST Metals accepted orders for exchange-traded commodity futures and options for its customers without being properly registered as a futures commission merchant ("FCM").

52.      ST Metals used the Loreley margin trading account with Berkeley for this aspect of its business.  The funds ultimately used to place commodity futures and options trades for ST Metals' customers took the same circuitous route to Berkeley as the funds used for its financed metals transactions.  After ST Metals received money from customers in its bank account, Escobio, or someone authorized by Escobio, transferred the funds to a Loreley bank account. Then Escobio, or someone at his direction, wired the funds from this Loreley bank account to Berkeley.

53.      ST Metals told Berkeley how to allocate the transferred funds between the various sub-accounts established for ST Metals customers.  ST Metals accepted orders for commodity

futures and options trades from its customers by telephone.  ST Metals then placed commodity

futures and options trades by phone for or on behalf of its customers.

54.     These commodity futures and options trades were ultimately executed on a U.S.

exchange through a Berkeley affiliate Macquarie Futures USA LLC.  The trades were then

reflected in the various sub-accounts ST Metals set up and maintained with Berkeley.

55.     From February 2011 through May 2013, ST Metals accepted at least $900,000

from at least eight customers to trade commodity futures and options on U.S. futures exchanges.

### VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND THE COMMISSION'S REGULATIONS

### COUNT ONE

**Violations of Section 4(a) of the Act:
Illegal, Off-Exchange Transactions**

56.     Paragraphs 1 through 55 are re-alleged and incorporated herein.

57.     During the relevant period, Defendant ST Metals offered to enter into, entered

into, executed, and confirmed the execution of financed retail commodity transactions.

58.     Defendants Escobio and Loreley conducted an office and business in the United

States for the purpose of accepting orders for and otherwise dealing in financed retail commodity

transactions.

59.      None of Defendants' financed retail commodity transactions were conducted on

or subject to the rules of a board of trade that has been designated or registered by the

Commission as a contract market.

60.     The persons with whom ST Metals offered to enter into, entered into, or

confirmed the execution of precious metals transactions were not ECPs or eligible commercial

participants, as defined by the Act, and were not engaged in a line of business related to precious metals.  Defendants thereby violated Section 4(a) of the Act, 7 U.S.C. § 6(a).

61.     The acts, failures, and omissions of Escobio and other officials, agents, or persons acting for ST Metals and Loreley occurred within the scope of their employment, agency, or office with ST Metals and Loreley, and are deemed to be the acts, failures, and omissions of ST Metals and Loreley by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.  ST Metals and Loreley are therefore liable for the acts, failures, and omissions of Escobio and other officials, agents or persons acting for these companies that are violations of Section 4(a) of the Act.

62.     Escobio controlled ST Metals and Loreley, and failed to act in good faith or knowingly induced the acts constituting ST Metals' and Loreley's violations described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Escobio is therefore liable as a controlling person for ST Metals' violations of Section 4(a) of the Act.

63.     Each offer to enter into, entrance into, and confirmation of the execution of a retail commodity transaction is alleged as a separate and distinct violation of Section 4(a) of the Act.

## COUNT TWO

### Violations of Section 4b of the Act:
### Fraudulent Omissions, Misrepresentations, False Reports and Statements

64.     Paragraphs 1 through 55 are re-alleged and incorporated herein.

65.     During the relevant period, ST Metals violated Section 4b(a)(2)(A) and (C) of the Act by making false representations of material fact and failing to disclose material facts to retail customers.  Likewise, ST Metals violated Section 4b(a)(2)(B) of the Act by making false reports and statements to the retail customer.

66.     ST Metals misrepresented that the retail customer purchased physical metals in the transaction, that the customer owned these metals, and that they were stored in a secure depository.

67.     ST Metals failed to disclose to its retail customers that rather than purchasing physical metals they transferred money to Loreley and subsequently placed off-exchange derivatives trades in a margin trading accounts at Hantec and Berkeley in the name of Loreley.

68.     ST Metals failed to disclose to its retail customers the substantial risks involved in this type of off-exchange derivatives trading, including the counterparty risk and credit risk associated with each of the entities involved in the multi-tiered scheme.

69.     ST Metals misrepresented that the retail customer received a loan to purchase physical metals in the transaction.  ST Metals hid from customers their scheme of charging interest on a non-existent loan while covering the customers' purported purchase of physical metals in margin trading accounts at Hantec and Berkeley.

70.     ST Metals made such misrepresentations in false reports and statements to the retail customers.

71.     ST Metals committed such acts intentionally or with reckless disregard for the truth.

72.     The acts, failures, and omissions of Escobio and other officials, agents, or persons acting for ST Metals occurred within the scope of their employment, agency, or office with ST Metals, and are deemed to be the acts, failures, and omissions of ST Metals by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.  ST Metals is therefore liable for Escobio's and other officials, agents, or persons acting for these

firms' acts, failures, and omissions that are violations of Section 4b(a)(2)(A), (B), and (C) of the Act.

73.    Escobio controlled ST Metals, and failed to act in good faith or knowingly induced the acts constituting ST Metals' violations described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Escobio is therefore liable as a controlling person for ST Metals' violations of Section 4b(a)(2)(A), (B), and (C) of the Act.

74.    Each misrepresentation and failure to disclose material facts, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the Act.  Each false report and statement, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(B) of the Act.

## COUNT THREE

### Violations of Section 6(c)(1) of the Act and Regulation 180.1(a): Deceptive Devices or Contrivances

75.    Paragraphs 1 through 55 are re-alleged and incorporated herein.

76.    During the relevant period, ST Metals violated Section 6(c)(1) of the Act and Regulation 180.1(a) by employing deceptive devices or contrivances in connection with contracts of sale of commodities in interstate commerce, including:

    a.   misrepresenting to customers that they purchased and owned physical metals in their financed transactions;

    b.   misrepresenting to customers that physical metals were stored for the customer at a depository;

    c.   failing to disclose to customers that their funds were funneled through Loreley, placed in a margin trading account, and used to trade off-exchange derivatives;

      d.   failing to disclose to their customers the substantial risks involved in trading off-exchange commodity derivatives including the counterparty and credit risk associated with the multi-tiered scheme set up by Escobio;

      e.   misrepresenting to customers that they received a loan to purchase physical metals; and

      f.   failing to disclose to customers their scheme of charging interest on a non-existent loan while covering the customers' purported purchase of physical metals in a margined trading account in the name of Loreley.

77.    ST Metals committed such acts intentionally or with reckless disregard for the truth.

78.    The acts, failures, and omissions of Escobio and other officials, agents, or persons acting for ST Metals occurred within the scope of their employment, agency, or office with ST Metals, and are deemed to be the acts, failures, and omissions of ST Metals by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.  ST Metals is therefore liable for the acts, failures and omissions of Escobio and other officials, agents, or persons acting for ST Metals that are violations of Section 6(c)(1) of the Act and Commission Regulation 180.1(a).

79.    Escobio controlled ST Metals, and failed to act in good faith or knowingly induced the acts constituting the violations by ST Metals described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Escobio is therefore liable as a controlling person for ST Metals' violations of Section 6(c)(1) of the Act and Commission Regulation 180.1(a).

80.     Each deceptive device or contrivance, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Commission Regulation 180.1(a).

### COUNT FOUR

**Violation of Section 4d of the Act:**
**Failure to Register and Acting as an Unregistered Futures Commission Merchant**

81.     Paragraphs 1 through 55 are re-alleged and incorporated herein.

82.     The Act sets out the definition of a FCM in Section 1(a), 7 U.S.C. § 1(a).  For the period at issue in this complaint up to July 16, 2011, the definition of FCM was in Section 1(a)(20).  For the period on or after July 16, 2011 the definition is in Section 1(a)(28).  ST Metals fell within the definition of a FCM both before and after it was amended effective July 16, 2011.

83.     Section 4d(a) of the Act, 7 U.S.C. § 6d(a) (2012), as relevant here, makes it unlawful for "any person to be a futures commission merchant unless – (1) such person shall have registered, under this Act, with the Commission as such futures commission merchant and such registration shall not have expired nor been suspended nor revoked . . ."

84.     As further described in paragraphs 51-55 above, for the time period February 2011 through May 2013 Defendant ST Metals operated as a FCM by (i) soliciting and accepting orders for the purchase or sale of commodities for future delivery and commodity options on or subject to the rules of a contract market, and (ii) accepting money, securities or property to margin, guarantee, or secure any trades or contracts that resulted therefrom.  Defendant ST Metals engaged in these transactions with non-ECPs.

85.     As further described in paragraphs 22-43 above, for the time period July 16, 2011 to May 2013, Defendant ST Metals operated as a FCM by (i) soliciting and accepting orders for retail commodity transactions, (ii) acting as a counterparty to retail commodity transactions, and

(iii) accepting money, securities or property to margin, guarantee, or secure any trades or contracts that resulted therefrom.

86.     Defendant ST Metals has never been registered with the Commission as a FCM, or in any other capacity, and is not exempt from the requirements of Section 4d(a) of the Act.

87.     By virtue of this conduct, Defendant ST Metals violated Section 4d(a) of the Act.

88.     The acts, failures, and omissions of Escobio and other officials, agents, or persons acting for ST Metals occurred within the scope of their employment, agency, or office with ST Metals, and are deemed to be the acts, failures, and omissions of ST Metals by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.  ST Metals is therefore liable for the acts, failures, and omissions of Escobio and other officials, agents or persons acting for ST Metals that are violations of Section 4d(a) of the Act.

89.     Each and every act by Defendant ST Metals in violation of Section 4d(a) of the Act, 7 U.S.C. § 6d(a), is alleged as a separate and distinct violation.

90.     Escobio controlled ST Metals, and failed to act in good faith or knowingly induced the acts constituting the violations described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Escobio is therefore liable as a controlling person for ST Metals' violations of Section 4d(a) of the Act.

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.      Find Defendants liable for violating Section 4(a) of the Act, 7 U.S.C. § 6(a); and Defendants ST Metals and Escobio liable for violating Section 4b(a)(2) of the Act, 7 U.S.C.

§ 6b(a)(2); Section 6(c)(1) of the Act, 7 U.S.C. § 9(1); Regulation 180.1(a), 17 C.F.R. § 180.1(a);

and Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1);

B.      Enter orders of preliminary and permanent injunction prohibiting Defendants, and

any other person or entity associated with them from, directly or indirectly, engaging in conduct

in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a); Section 4b(a)(2)(A)-(C) of the Act,

7 U.S.C. § 6b(a)(2)(A)-(C); Section 6(c)(1) of the Act, 7 U.S.C. § 9(1); Regulation 180.1(a),

17 C.F.R. § 180.1(a); and Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1);

C.      Enter orders of preliminary and permanent injunction enjoining Defendants and

all persons insofar as they are acting in the capacity of their agents, servants, employees,

successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or

participation with Defendants who receive actual notice of such order by personal service or

otherwise, from directly or indirectly:

1.      trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a);

2.      entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Commission Regulation 1.3(hh), 17 C.F.R. § 1.3(hh)), security futures products, foreign currency (as described in Section 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts"), and/or swaps (as that term is defined in Section 1a(47) of the Act, 7 U.S.C. § 1a(47), and as further defined by Regulation 1.3(xxx), 17 C.F.R. § 1.3 (2012)) for their own personal account or for any  account in which they have a direct or indirect interest;

3.      having any commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps traded on their behalf;

4.      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps;

5.      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, forex contracts, and/or swaps;

6.      applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and

7.      acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent, or any other officer or employee of any person (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a) registered, exempted from registration, or required to be registered with the Commission, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9);

D.      Enter an order requiring Defendants to disgorge, pursuant to such procedure as the Court may order, all benefits received, including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E.      Enter an order directing Defendants and any successors thereof to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any customers whose funds were received by Defendants as a result of the acts and practices that constitute violations of the Act as described herein;

F.      Enter an order requiring Defendants to make restitution, pursuant to such procedure as the Court may order, by making whole each and every customer whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

G.      Enter an order directing Defendants to pay civil monetary penalties in the amount of not more than the greater of (1) triple the monetary gain to each Defendant for each violation of the Act, or (2) $140,000 for each violation of the Act;

H.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Date: July 23, 2014                         Respectfully submitted,

                                            Attorneys for Plaintiff
                                            U.S. Commodity Futures Trading Commission

                                            */s/ Carlin Metzger*
                                            _____
                                            Carlin Metzger (cmetzger@cftc.gov)
                                            Senior Trial Attorney
                                            Commodity Futures Trading Commission
                                            525 West Monroe Street, Suite 1100
                                            Chicago, Illinois 60661
                                            Telephone: (312) 596-0536
                                            Fax: (312) 596-0714
                                            Special Bar ID # A5501599
                                            Illinois Bar No. 6275516

                                            Joseph Konizeski (jkonizeski@cftc.gov)
                                            Chief Trial Attorney
                                            Special Bar ID # A5501602

                                            Rosemary Hollinger (rhollinger@cftc.gov)
                                            Regional Counsel
                                            Bar ID # A5500849