UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| SOUTHERN TRUST METALS, INC., LORELEY OVERSEAS CORPORATION, and ROBERT ESCOBIO, | ) ) ) ) ) |
| Defendants. | ) ) |

CASE NO. 1:14-cv-22739-JLK

**[DEFENDANTS' PROPOSED] ORDER DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

THIS CAUSE is before the Court upon U.S. Commodity Futures Trading Commission's ("CFTC") motion for summary judgment on Counts I, for alleged illegal leveraged commodity transactions, and Count IV, for allegedly acting as an unregistered futures commissions merchant (D.E. 68). The Court heard oral argument on this motion at the January 7, 2016 Pretrial Conference. Defendants Robert Escobio, Loreley Overseas Corporation ("Loreley"), and Southern Trust Metals ("ST Metals") also moved for summary judgment (D.E. 66), on separate but connected grounds. Primarily Defendant Escobio maintains an estoppel defense that, if he prevails, would bar this enforcement action. Also, Defendants themselves move for summary judgment on Count IV. The Court did not hear oral argument on Defendants' motion but continued the Pretrial Conference, to be reset, for that purpose. This Court does not need to wait for Defendants' motion to deny the CFTC's motion, however. As the Court preliminarily stated at the January 7 Pretrial Conference, there are many issues of material contested fact precluding summary judgment for the CFTC.

1

## I. Issues of fact prevent summary judgment on Count I.

Defendant ST Metals sold investments in precious metals. The company offered two types of products—fully paid transactions in precious metals, offered through FideliTrade and Pershing, and leveraged transactions, offered through two London-based firms, Hantec and Berkeley. Def's Amended Statement of Facts disputing Plaintiff's motion ("SODF"), D.E. 84 ¶ 2, 34. ST Metals' parent company, the BVI company Loreley, held sub-accounts corresponding to each customer at Hantec and Berkeley. Customers bought precious metals in these sub-accounts. SODF ¶ 3.

ST Metals' business got under way in 2010, before the Dodd-Frank amendments to the Commodity Exchange Act ("the Act") took effect in July 2011. SODF ¶ 1. The Dodd-Frank amendments expanded CFTC regulatory jurisdiction to cover certain financed or leveraged "retail commodity transactions." This new grant of jurisdiction, added to § 2(c)(2)(D) of the Act, excludes "Eligible Contract Participants," essentially wealthy individuals (defined by the Act to have $5 million or more in discretionary investments) "who can look out for themselves directly or by hiring experts." *See* 7 U.S.C. §2(c)(2)(D); 7 U.S.C. § 1a(12); *CFTC v. Zelener*, 373 F.3d 861, 862 (7th Cir. 2004). The statute also has express exceptions. If the transaction results in "actual delivery" of the commodity within 28 days, there is no jurisdiction. Nor does the CFTC have jurisdiction over a transaction that "creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively...." *See* 7 U.S.C. §2(c)(2)(D)(ii). Several ST Metals customers were alleged to be multi-millionaires and, thus, there is a material factual controversy whether they qualify as ECPs. SODF ¶ 11. Also, the record is undisputed that ST Metals made delivery on its fully paid transactions many times, SODF ¶ 3, as evidenced by delivery receipts. D.E. 84-5.

In an effort to ensure its London metals dealers complied with Dodd-Frank, ST Metals asked one of its former directors Robert Escobio (he resigned in 2009) to visit Hantec while he was in London in November 2011. SODF ¶ 13. Mr. Escobio met with Hantec's CEO, Bashir Nurmohamed, who gave him a number of assurances. Mr. Nurmohamed told Mr. Escobio that Hantec was Dodd-Frank compliant, and that Hantec made delivery through UK depository banks, including Standard Charter and Barclays, which had metals and held it for accounts. As evidence of this, Mr. Nurmohamed presented Mr. Escobio with receipts showing delivery, he said within 2 days, of bullion to the depositories. Mr. Nurmohamed also said Hantec could arrange for delivery to the customers directly once they paid for the metals in full. *Id*.

Mr. Nurmohamed confirmed the conversation in writing on November 18, 2011: "We confirm that any Gold or Silver you purchase from us is <u>held for your account</u> and upon full payment we are able to arrange delivery for you when requested." D.E. 84-2. Later in 2013, when ST Metals again sought assurance that it was indeed physical metals and not merely contracts, Mr. Nurmohamed wrote once more, "I can confirm that <u>you hold accounts with us that only trade Silver Bullion</u>." *Id*. (emphasis added).

ST Metals also reached out to Berkeley for assurances it was selling "bullion" and received a similar written response: "I can confirm that all Loreley accounts with the prefix X1LOR were <u>silver bullion</u> accounts. These accounts <u>only</u> traded in OTC <u>silver bullion</u> and <u>never</u> traded any futures contracts." *Id*. (emphasis added).

Berkeley, like Hantec, also confirmed its relationship with a London bank, Standard Charter, that holds bullion, both allocated and unallocated, on deposit. D.E. 84-3 at 119:23-121:12. Berkeley's principal testified it makes delivery, not just for the customer's benefit but to the customer directly:

3

> Q. Now, let's be clear. A customer of Berkeley, when they buy bullion, has the ability to ask Berkeley to deliver it, correct?
>
> A. We will always -- sorry. To answer your specific question, <u>a client can ask us to take delivery of bullion, yes</u>.
>
> Q. And you will go out and make the arrangements for the bullion to be delivered to the customer?
>
> A.  We could do that, yes.

*Id*.

The CFTC alleges Defendants violated § 2(c)(2)(D) because, it claims, ST Metals supposedly never delivered any metal, at least on its leveraged transactions. That does not matter, however, if "actual delivery" were taking place within the meaning of the statute. And the term "actual delivery" has an extensive agency interpretation, promulgated no less by the CFTC in August 2013. *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 FR 52426-01 (Aug. 23, 2013). That Interpretation, to which this Court owes deference, *see Zelener*, 373 F.3d at 867 (finding "[w]hen Congress has told an agency to resolve a problem, then courts must accept the answer"), allows for "actual delivery" to take place in a third-party depository.  Retail Commodity Transactions, 78 FR 52426-01 at Example 2 (Aug. 23, 2013) (allowing for delivery "into the possession of a depository other than the seller"). That only makes sense on leveraged transactions; firms would otherwise be put in the untenable position of either having to deliver metal that has not been paid for, or violating § 2(c)(2)(D). The CFTC Interpretation has two condition for using an independent depository: the entire amount purchased on leverage must be delivered—it can be a specific allocated amount, or it can be unallocated, as long as the total is there—and title must transfer to the customer.

The CFTC claims Hantec and Berkeley supposedly owned no metal to deliver, pointing to deposition testimony of Hantec and Berkeley representatives. But those same representatives

admitted to providing the written statements making plain reference to physical metals, the accuracy of which they did not deny. Hantec wrote ST Metals that "Gold or Silver you purchase from us is <u>held for your account</u>," and confirmed that ST Metals "<u>hold[s] accounts with us that only trade Silver Bullion.</u>" D.E. 84-2 (emphasis added). "Bullion" is the industry terms for physical metals. SODF ¶ 3. And Hantec's website promotes long term investment in gold, D.E. 84-1 at 95:3-97:12—a clear reference to physical metal, as neither futures transactions nor "spot" transactions are designed for "long term" investment. *See Zelener*, 373 F.3d at 863, 865. Berkeley made the same representation: "I can confirm that all Loreley accounts with the prefix X1LOR were <u>silver bullion</u> accounts. These accounts <u>only</u> traded in OTC <u>silver bullion</u> and <u>never</u> traded any futures contracts." D.E. 84-1 (emphasis added). Both Berkeley and Hantec also clearly stated they could arrange for delivery. D.E. 84-2; D.E. 84-3 at 119:23-121:12. And evidence exists they had relationships with London banks—i.e., depositories—that store metal. *Id*.

   This record presents disputed facts about whether "actual delivery" occurred within the meaning of the statute. The CFTC has presented no evidence, other than conflicting and disputed or impeached deposition testimony, to support the contention that no precious metals existed. Hantec and Berkeley said it did, and were prepared to make delivery directly to customers. These disputed facts distinguish this case from *CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967 (11th Cir. 2014), the CFTC's favored case. In *Hunter Wise* the trial court found no gold, no depository, and only "sham" transfers. *See id*. at 970. And that was after an evidentiary hearing and entry of detailed factual findings. *See id*.

   Moreover, the CFTC Interpretation, which the Eleventh Circuit endorses in *Hunter Wise*, *id*. at 980, makes "actual delivery" inherently fact intensive. The examples it sets out are not

meant to be exclusive or stringently applied. Instead, the Interpretation says variations are possible, such as where "delivery" to the depository could be from stores of metal already on deposit. The facts may well prove that ST Metals had that arrangement. The goal is to distinguish those cases where real efforts are made to deliver to customers, whether to their house or to a neutral depository, from those cases where it was all a sham. *See* Retail Commodity Transactions, 78 FR 52426-01 (Aug. 23, 2013) (explaining "[t]he examples are non-exclusive," and calling for "a careful consideration of the other relevant factors enumerated in the Interpretation [to] demonstrate[] that the purported delivery is not simply a sham"). With clear statements from ST Metals' London firms that they had metal and could deliver, there is no basis for this Court to conclude at this summary judgment juncture it was in any way a "sham."

Defendants rely on § 2(c)(2)(D)'s other exception, for transactions that "create[] an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively...." The record contains evidence that ST Metals was prepared to make delivery directly to the customers who asked for it, and did so many times on fully paid transactions. D.E. 84-5. Leveraged transactions can become fully paid after "actual delivery," as the CFTC Interpretation contemplates. The question at that point is whether the depositories "have the ability to deliver." The record shows ST Metals asked for assurance that the London firms could arrange for delivery, and Berkeley and Hantec said they could. D.E. 84-2 and 84-3 at 119:23-121:12. Disputed record evidence therefore exists to satisfy the "ability to deliver and accept delivery" exception. That also precludes summary judgment on count I.

There is also the question of ECPs. It is the CFTC's burden, as a necessary part of obtaining jurisdiction over the transactions, to show ST Metals transactions with retail customers. The CFTC has not presented evidence establishing this jurisdictional threshold as an

6

undisputed fact. The CFTC has four customer affidavits with generic, conclusory statements that the customers supposedly had less that the ECP statutory amount. As this Court found in another U.S. government agency action, *Bonilla v. U.S. Dep't of Justice*, No. 10-22168-CV, 2011 WL 122023, at *2 (S.D. Fla. Jan. 13, 2011) (King, J.), "[a]n affidavit that is 'conclusory, merely reciting statutory standards, or [that is] too vague or sweeping' is not sufficient." *Id*. (citing *King v. Dept. of Justice,* 830 F.2d 210, 219 (D.C. Cir. 1987)). Defendants have presented evidence that at least two of its customers, including one of the affiants, are extremely wealthy. SODF ¶ 11. The CFTC would have to prove ST Metals did leveraged transactions with retail customers.

For all these reasons the CFTC's motion for summary judgment in Count I is denied.

## II. Defendants are entitled to summary judgment on Count IV.

Count IV is about futures transactions in eight ST Metals customer sub-accounts at Berkeley. The CFTC contends ST Metals acted as a futures commission merchant ("FCM") with respect to these transactions in violation of § 4d of the Act (7 U.S.C. § 6d). To qualify as an FCM under the statute, a party must both "accept[ ] orders" for commodity futures or options transactions, and "accept[ ] any money" for the trades. 7 U.S.C. § 1a(28). The CFTC has presented no evidence that any account at ST Metals was opened or funded to trade futures transactions. On the other hand, ST Metals has presented evidence that accounts were opened solely to trade physical precious metals, and the money used for futures transactions was already on deposit in the customer sub-accounts at Berkeley. D.E. 84-8; SODF ¶ 21. The record also contains undisputed evidence that each party involved in the transactions, from the brokers, the traders, Berkeley itself, to the firm that ultimately placed the trade (a registered FCM called Macquarie) were licensed and authorized to do futures transactions. SODF ¶ 18, 21, 23, 24, 26. Because the CFTC has not refuted ST Metals' evidence with affirmative, contrary evidence,

summary judgment is appropriate for ST Metals on Count IV in relation to the alleged futures transactions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2511 (1986) (holding a plaintiff "must present affirmative evidence in order to defeat a properly supported motion for summary judgment").

ST Metals therefore is entitled to summary judgment on Count IV, and the CFTC's motion for summary judgment on that Count is denied..

### III. Issues of fact prevent summary judgment against Robert Escobio.

The CFTC wants Robert Escobio to be liable under Counts I and IV on control person grounds under 7 U.S.C. § 13c(b). This is a derivative claim and, therefore, the CFTC's motion is denied for all the reasons stated above. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) (finding "the dismissal of Count One … necessarily requires the dismissal of Count Two, which pertains to control-person liability…. As noted above, control-person liability exists only where there is a primary violation"). Summary judgment is inappropriate in any event. Under the statute, the CFTC "has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." 7 U.S.C. § 13c(b). The CFTC must show both that Mr. Escobio "actually exercised general control over the operation of the entity principally liable" <u>and</u> that he "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated . . . ." *See, e.g., See CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002) (citing *Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993)).

Record evidence shows Robert Escobio was instrumental in getting the written assurances from Hantec and Berkeley that they traded physical precious metals and had the ability to deliver straight to customers. SODF ¶¶ 3, 13. Record evidence also reflects that ST

Metals retained counsel to advise it on Dodd-Frank (though ST Metals has maintained an attorney-client privilege on what the advice was). *Id*. ¶¶ 46-48, 62. There further is disputed record evidence on what systems were in place among ST Metals brokers to vet customers for their investment experience and risk tolerance, as well as disputed facts concerning Robert Escobio's role in ST Metals' leveraged transactions after the effective date of July 2011 of Dodd-Frank. *See* SODF ¶¶ 46-49. The CFTC therefore insists Robert Escobio was a control person of ST Metals and Loreley, and Mr. Escobio has disputed those allegations with specific facts demonstrating good faith. On this record, the Court cannot conclude Robert Escobio did not act in good faith or knowingly induced the alleged violations.

Accordingly, it is

**ORDERED AND ADJUDGED** that the CFTC's motion for summary judgment on Count I and IV is **DENIED**, and summary judgment is **GRANTED** in favor of Defendants as to Count IV.

**DONE AND ORDERED** in Chambers, United States District Court for the Southern District of Florida, this _____ day of_____ , 2016.

							_____
							HONORABLE JAMES LAWRENCE KING
							UNITED STATES DISTRICT JUDGE

cc:	Counsel of Record