## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:14-CV-22739-KING

|  |  |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | ) ) ) |
| **Plaintiff,** | ) ) ) |
| v. | ) ) |
| **SOUTHERN TRUST METALS, INC., LORELEY OVERSEAS CORPORATION, and ROBERT ESCOBIO,** | ) ) ) ) |
| **Defendants.** | ) ) ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CASE** comes before the Court for final disposition of the issues presented during a bench trial held from July 25 through July 27, 2016. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. INTRODUCTION

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC") seeks judgment against Defendant Southern Trust Metals, Inc. ("Southern Trust") for violations of the anti-fraud provisions of the Commodity Exchange Act (the "Act") and accompanying regulations, including Section 4b(a) of the Act, 7 U.S.C § 6b(a), Section 6(c), 7 U.S.C. § 9, and CFTC Regulation 180.1, 17 C.F.R. § 180.1. DE 1 at ¶¶ 56-74. The CFTC also seeks a permanent injunction as well as an award of restitution and imposition of civil monetary penalties against Defendants on all charges in the Complaint.

The Complaint alleges Southern Trust held itself out to the public as a seller of physical precious metals that customers could purchase on a leveraged basis, i.e., with loans. *Id.* at ¶¶ 22-25. Southern Trust represented to customers that they were purchasing actual physical metals stored in their name at a depository. *Id.* at ¶¶ 22-25. Southern Trust also represented to customers that they were receiving loans for the purchase of metals, for which Southern Trust charged the customers interest. *Id.* at ¶ 6.

In reality, the CFTC asserts, there were no physical precious metals, and no loans. *Id.* at ¶¶ 30-31. Instead, Southern Trust was transferring customer funds through Loreley Overseas Corp. ("Loreley"), a British Virgin Islands subsidiary, to London-based margin trading firms Hantec Global Markets, Ltd. ("Hantec") and Berkeley Futures, Ltd. ("Berkeley"). *Id.* at ¶¶ 30-31. At Hantec and Berkeley, the customer funds were used to purchase derivative contracts designed to hedge Southern Trust's exposure to customer positions. *Id.* at ¶ 42. The loans extended to customers were entirely fictional, and Southern Trust and its brokers simply pocketed the interest. *Id.* at ¶ 44. None of these details were disclosed to customers, who believed they were receiving loans to purchase physical precious metals. *Id.* at ¶ 49.

## II. PROCEDURAL HISTORY

The Court previously entered summary judgment for the CFTC on Counts I and IV of its Complaint. DE 122. Count I alleges Defendants Southern Trust and Loreley engaged in off-exchange retail leveraged commodity transactions in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a). *Id.* at 8-9. These leveraged commodity transactions are the same transactions that form the basis for the CFTC's fraud claims. In ruling for the CFTC on the Section 4(a) claim, the Court held that Defendants failed to adduce any evidence of actual delivery of any physical metals for their leveraged metals customers. *Id.* at 9. In ruling for the CFTC on Count IV, the

2

Court held Southern Trust failed to register as a futures commission merchant in violation of Section 4d of the Act, 7 U.S.C. § 6d. *Id.* at 9-10.

The Court also entered summary judgment in favor of the CFTC on the issue of control person liability against Defendant Robert Escobio pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b). *Id.* at 10-13. In so holding, the Court found that Robert Escobio had general control over Defendants Southern Trust and Loreley. *Id.* at 10-11. The Court also held that Robert Escobio acted in bad faith by deliberately failing to act with reasonable diligence or to institute adequate internal controls. *Id.* at 11-12. Moreover, the Court found that Robert Escobio knowingly induced Southern Trust's and Loreley's violations of the Act. *Id.* at 12-13. As a result of this ruling, Mr. Escobio is jointly and severally liable for violations of the Act committed by Southern Trust or Loreley. 7 U.S.C. § 13c(b).

## III. FACTUAL BACKGROUND

### A. Representations to Customers

Southern Trust Metals represented to customers that they were purchasing, and indeed owned, physical metals that were held in depositories. Southern Trust Metals also represented that customers were receiving loans to purchase those metals, for which the customers were charged interest. Southern Trust perpetuated these misrepresentations through promotional materials, account documents, and sales calls, as well as through discussions with customers about its fees and commissions.

### 1. Promotional Materials

Southern Trust sent its sales brochure to all prospective customers touting the benefits of Southern Trust's leveraged metals program. Transcript of Bench Trial, July 26, 2016 at 16:14-17:1 (Testimony of Peter Rukrigl); CFTC Ex. 124 at 5-6. The brochure compared leveraged

3

metals to a "home mortgage," and described the metals offered by Southern Trust as a "hard currency" that "derive[s] intrinsic value from [their] relative scarcity." CFTC Ex. 124 at 7, 9. The brochure said that customers "can take physical possession of [their] metals in New York or London." *Id.* at 11. The brochure encouraged customers to "keep [their] metals on deposit" so as to "enjoy instant liquidity." *Id.* at 11. Southern Trust also had a website that made similar representations about leveraged metals. CFTC Ex. 82.

Southern Trust sent prospective customers a "customer worksheet," which was available on Southern Trust's website. Transcript of Bench Trial, July 26, 2016 at 13:20-14:3, 23:5-23:23, 56:10-56:18 (Rukrigl Testimony). Southern Trust brokers would walk prospective customers through the worksheet and explain to them how leverage could result in their ownership of more metals and greater profit. CFTC Ex. 82 at 14; Transcript of Bench Trial, July 26, 2016 at 13:20-14:3, 56:10-56:18 (Rukrigl Testimony); Transcript of Bench Trial, July 25, 2016 at 6:6-6:12 (Testimony of Jean Jeffries).

### 2. Account Documents

Southern Trust required customers to fill out an account opening form which included a section called "risk factors and disclosure statement." CFTC Ex. 82 at 17; Transcript of Bench Trial, July 26, 2016 at 14:7-14:16 (Rukrigl Testimony). The disclosure statement explained that customers were investing in "physical precious metals," and advised customers that their metals could "either be delivered directly to the client's designated point of delivery or to a recognized depository, which provides insured non-segregated storage." CFTC Ex. 82 at 17.

Once a customer's account was open, Southern Trust generated trade confirmations and monthly account statements that it sent to customers. Transcript of Bench Trial, July 26, 2016 at 111:18-111:20 (Testimony of Victor Casado), 67:19-67:25 (Rukrigl Testimony). The trade

4

confirmations purported to show purchases of physical metals by customers, setting forth the "description" (usually "silver"), and quantity in ounces of the purchase.  Transcript of Bench Trial, July 26, 2016  at 112:5-112:13 (Casado Testimony); Transcript of Bench Trial, July 25, 2016 at 10:11-10:24 (Jeffries Testimony); CFTC Exs. 131, 137C.  The trade confirmations state that customers should "allow up to 7 days for delivery," and that customers will be "charged for delivery."  CFTC Ex. 131.

Customers' monthly account statements purported to show the type of physical metals owned by the customer, as well as the weight of the metal purchased in ounces.  CFTC Exs. 43, 126, 136F.  The account statements showed the balance of the loan (up to 70% of the value of the metal purchased), and the interest accruing on the loan.  *Id.*

### 3. Sales Calls

In telephone conversations, Southern Trust brokers told customers they were purchasing actual physical metals, and the metals were stored in London or Hong Kong.  Transcript of Bench Trial, July 25, 2016 (Jeffries Testimony), 45:19-45:24, 46:13-46:15 (Testimony of Wolfgang Helfricht), 92:12-92:18, 116:13-116:25, 117:17-117:22 (Testimony of Donald Roach), 122:2-122:8 (Testimony of Michael Newquist), 149:7-149:15 (Testimony of Kelly Rogers); Transcript of Bench Trial, July 26, 2016  at 21:23-22:3, 22:14-23:3, 50:20-50:24, 51:18-51:25 (Rukrigl Testimony), 79:2-79:4, 88:8-88:9, 89:19-89:22 (Testimony of Mariano Llosa); CFTC Ex. 40.  The brokers also told customers that they could take out a loan with which to purchase additional metals.  Transcript of Bench Trial, July 25, 2016  at 8:4-8:25 (Jeffries Testimony), 47:5-47:13 (Helfricht Testimony), 92:22-93:05 (Roach Testimony); Transcript of Bench Trial, July 26, 2016  at 18:10-18:23, 52:25-53:10 (Rukrigl Testimony), 79:9-80:7 (Llosa Testimony).

5

Southern Trust brokers told customers that the interest charge included "storage fees" and other fees associated with owning physical metals. Transcript of Bench Trial, July 26, 2016 at 60:6-60:9 (Rukrigl Testimony); Transcript of Bench Trial, July 25, 2016 at 9:5-9:18 (Jeffries Testimony); CFTC Ex. 40 (noting "storage fees").

### 4.    Fees and Commissions

Southern Trust told its customers it would charge them a one-time fee of 1% to 3% of the account upon opening, depending on the size of the account. Transcript of Bench Trial, July 26, 2016 at 74:21-75:11 (Rukrigl Testimony), 94:7-94:12 (Llosa Testimony). Customer purchases were subject to commissions of between 2.5% and 3%. *Id.* at 74:21-75:11 (Rukrigl Testimony), 93:21-94:1 (Llosa Testimony). For the loans, customers were charged an annual interest rate of between 6% and 7%. Transcript of Bench Trial, July 25, 2016 at 47:5-47:13 (Helfricht Testimony); Transcript of Bench Trial, July 26, 2016 at 74:21-75:11 (Rukrigl Testimony), 80:8-80:14, 94:2-94:6 (Llosa Testimony).

## B.    Transfer of Customer Funds to Loreley, then Hantec and Berkeley

Unbeknownst to customers, Southern Trust sent customer funds to Loreley, who in turn sent them to Hantec and Berkeley in the UK. DE 122 at 4, 9. The accounts at Hantec and Berkeley were in Loreley's name, and not in the name of Southern Trust's customers. Transcript of Bench Trial, July 26, 2016 at 199:6-199:7 (Testimony of Robert Escobio); CFTC Exs. 8, 23; CFTC Ex. 155 at 19:14-20:10, 24:8-24:14 (Deposition of Chris Thompson) [hereinafter, "Berkeley Dep."]; CFTC Ex. 156 at 39:14-40:3 (Deposition of Bashir Nurmohamed) [hereinafter, "Hantec Dep."].

When customers placed an order with Southern Trust, Southern Trust placed its own order, through Loreley, with Hantec or Berkeley in a numbered sub-account. Transcript of

Bench Trial, July 26, 2016 at 113:15-113:17 (Casado Testimony).  Southern Trust back-office

personnel kept track of which Hantec or Berkeley sub-account corresponded with which

Southern Trust customer account. *Id.* at 113:22-114:14 (Casado Testimony).  Hantec and

Berkeley had no knowledge of or relationship with Southern Trust's customers.   Hantec Dep. at

39:14-40:3; Berkeley Dep. at 19:14-20:10, 24:8-24:14.

    Southern Trust brokers did not disclose any of this to their customers, and made no

mention of Hantec or Berkeley. Transcript of Bench Trial, July 26, 2016at 90:16-90:19 (Llosa

Testimony), 52:8-52:10 (Rukrigl Testimony).  Southern Trust's customers were unaware that

their funds and their orders were being transferred to Loreley, or to Hantec or Berkeley.

Transcript of Bench Trial, July 25, 2016 at 13:13-13:25 (Jeffries Testimony), 95:17-95:25

(Roach Testimony), 123:8-123:16 (Newquist Testimony), 146:3-146:9 (Rogers Testimony).

**C.    No Physical Metals**

    Southern Trust did not store metals on behalf of its customers, nor did Southern Trust

have any agreements with depositories to store metals on behalf of customers.  Transcript of

Bench Trial, July 26, 2016 at 186:19-187:3 (Escobio Testimony).  During this litigation,

Southern Trust argued the trades at Hantec and Berkeley resulted in the transfer of ownership of

physical metals in depositories.  DE 122 at 9.  In entering summary judgment on the CFTC's

Section 4(a) claim, the Court rejected Defendants' contention that Hantec and Berkeley took

delivery of physical precious metals on behalf of Southern Trust's customers via depositories in

the UK.  *Id.* at 9.  That holding applies with equal force in context of the CFTC's fraud claims.

    ST Metal's trading at Hantec and Berkeley was in margined derivative contracts, not

physical metals.  Hantec Dep. at 10:3-10:14, 11:4-11:7; Berkeley Dep. at 16:3-16:25.  Loreley

held no title to any physical metals as a result of its trading, and Loreley's trading in its margin

accounts did not result in the transfer or delivery of any physical metal.  Hantec Dep. at 67:16-67:21; Berkeley Dep. at  78:15-78:17, 79:5-79:8, 103:18-103:21, 104:2-104:11.

This is reflected in Loreley's monthly account statements from Hantec and Berkeley, which show trading in margined derivative contracts.  CFTC Exs. 128, 129.  It is also reflected in Loreley's account opening documents with Hantec and Berkeley.

The Hantec account opening documents include a product disclosure statement which explains that, "we do not deliver the physical underlying assets (ie. gold or silver) to you, and you have no legal right to it."  CFTC Ex. 133, at 3; *see also* CFTC Ex. 23, at 5; Hantec Dep. at 46:19-47:6.)  The Hantec account opening documents also state that Loreley's business is "dealing physical metals" and its purpose in opening an account with Hantec was to "hedg[e] their exposure. . . ."  Hantec Dep., Ex. 2.

The Berkeley account opening documents state that Loreley is engaging in "over the counter & other off exchange contracts (including bullion)."  CFTC Ex. 8, at 2-3.  The Berkeley account opening documents also state that Loreley "wish[ed] to speculate in *derivative products* which involves a high level or risk and that your investment horizon for individual transactions is short term (less than 3 months.)"  CFTC Ex. 8 at 3 (emphasis supplied).

### D.     No Loans

As no physical metals were ever purchased in connection with the transactions at issue, there were never any loans to purchase physical metals.  Nonetheless, Defendants maintain that loans were provided to customers - not by Southern Trust, but by Hantec and Berkeley.  Transcript of Bench Trial, July 27, 2016  at 9:10-9:21, 23:3-23:6.

Hantec and Berkeley have never loaned money to any customer, nor have Hantec or Berkeley charged interest to any customer.  Hantec Dep. at 40:3-40:20; Berkeley Dep. at 31:10-

31:18, 59:8-59:18.  Southern Trust's margin trading at Hantec and Berkeley did not involve any

kind of loan, nor did it even involve an extension of credit.  Hantec Dep. at 66:11-66:18;

Berkeley Dep. at 129:11-130:3.

The record is bereft of any loan agreements, collateral agreements, disbursements of

funds, or other evidence one would expect to see in connection with a loan for the purchase of

physical assets.  Transcript of Bench Trial, July 27, 2016  at 3:17-4:3, 4:14-4:21, 5:15-7:9, 10:5-

11:3, 21:25-24:1 (Escobio Testimony).  Mr. Escobio claims that the loan agreements are

contained in Loreley's account opening documents with Hantec and Berkeley.  *Id.* at 10:18-

10:20; 23:3-23:8 (Escobio Testimony).  The account opening documents, however, make no

mention of any loans or interest.  CFTC Exs. 8, 23. Nor does anything in Loreley's monthly

statements from Hantec or Berkeley reflect any loan or interest.  CFTC Exs. 128, 129.

**E.      Losses Suffered by Defendants' Customers**

As set out in this Court's April 7, 2016 order granting partial summary judgment,

Defendants engaged in two schemes: (1) the unregistered futures scheme; and (2) the leveraged

precious metals scheme. DE 122.  The customer losses and gains relating to both schemes are

described separately below.  Southern Trust failed to produce a complete set of customer account

statements.  Transcript of Bench Trial, July 27, 2016 at 63:6-63:7 (Testimony of Heather

Johnson).   Nonetheless, customer losses can be calculated via the underlying sub-account

statements for the Loreley accounts at Hantec and Berkeley.

**1.      Customer Losses From Southern Trust's Unregistered Futures Scheme**

Southern Trust used a trading account at Berkeley to execute futures trades on U.S.

exchanges.  Futures trading sub-accounts for the Loreley account at Berkeley were designated

with a prefix of "LOF," while metals trading accounts were designated with a "LOR" prefix.

Berkeley Dep. at 66:15-20, 84:17-18; CFTC Ex. 84.

9

Southern Trust's futures customers suffered losses totaling $559,725. Berkeley's monthly account statements show that seven of the eight futures customers collectively lost $199,388 trading futures and options through Southern Trust.[1] CFTC Exs. 128, 134. Southern Trust also charged commissions to its futures customers in the amount of $360,337. CFTC Ex. 109.

## 2. Customer Losses From Defendants' Leveraged Metals Scheme

During the relevant period,[2] seventy-eight leveraged metals customers suffered losses totaling $1,543,892. Of those losses, $764,759 is attributable to fees, commissions, and interest. Form W-2s for Mr. Rukrigl and Mr. Llosa show that the Southern Trust brokers earned $382,379 between 2011 and 2012. CFTC Ex. 88. The brokers split the fees, commissions, and interest 50/50 with Southern Trust. Transcript of Bench Trial, July 26, 2016 at 34:22-36:2 (Rukrigl Testimony), 94:16-95:4 (Llosa Testimony). The remaining $779,133 is customer losses from derivatives trading in Loreley's account. CFTC Exs. 128, 129, 134.

## IV. SOUTHERN TRUST'S LIABILITY FOR FRAUD

The CFTC has brought fraud claims against Southern Trust under Section 4b(a) of the Act, 7 U.S.C § 6b(a), as well as Section 6(c) of the Act, 7 U.S.C § 9, and its accompanying regulation, 17 C.F.R. § 180.1. A defendant is liable under Section 4b(a)[3] of the Act if the CFTC

---

[1] The Loreley account at Berkeley Futures U.K. was transferred to Berkeley Bahamas in November 2012. Berkeley Dep. at 85:7-85:10. Berkeley Bahamas is an affiliate of Berkeley futures which executes all of its business through Berkeley Futures U.K. Berkeley Dep. at 55:17-56:3. They are effectively the same for purposes of the transactions at issue in this case and therefore there are collectively referred to as "Berkeley" throughout this Order.

[2] The relevant time period for purposes of the leveraged metals scheme begins on July 16, 2011, the effective date of Section 2(c)(2)(D) of the Commodity Exchange Act, and ends on April 31, 2013 as Southern Trust liquidated the trading positions in its Loreley trading accounts at Hantec and Berkeley in April 2013.

[3] Section 4b(a) provides that "it shall be unlawful--(1) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate

demonstrates: "(1) the making of a misrepresentation, misleading statement, or a deceptive

omission; (2) scienter; and (3) materiality." *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328

(11th Cir. 2002). The same elements apply with respect to Regulation 180.1.[4] *Hunter Wise*, 21

F. Supp. 3d at 1347.

      "In an enforcement action brought to protect the public interest, the Commission need

not prove reliance to establish an antifraud violation." *CFTC v. Gutterman*, No. 12-21047-CIV,

2012 WL 2413082, at *5 (S.D. Fla. June 26, 2012) (citing *R.J. Fitzgerald*, 310 F.3d at 1328 n.

6). The CFTC, like the SEC and other government enforcement agencies, does not need to prove

loss causation as an element of a fraud claim. *SEC v. Goble*, 682 F.3d 934, 942–43 (11th Cir.

2012) ("Because this is a civil enforcement action . . . reliance, damages, and loss causation are

not required elements.").

## A.    Misrepresentations and Omissions

      Judge Middlebrooks was confronted with misstatements in *Hunter Wise* similar to the

ones at bar. Hunter Wise "prepared and distributed documents, including account statements …

and trade confirmation notices, to the retail customers confirming the existence of the metals, the

---

commerce or for future delivery that is made, or to be made, on or subject to the rules of a
designated contract market, for or on behalf of any other person; or (2) for any person, in or in
connection with any order to make, or the making of, any contract of sale of any commodity for
future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other
person, other than on or subject to the rules of a designated contract market--(A) to cheat or
defraud or attempt to cheat or defraud the other person …." 7 U.S.C. § 6b(a).

[4] Regulation 180.1 provides that "it shall be unlawful for any person, directly or indirectly, in
connection with any swap, or contract of sale of any commodity in interstate commerce, or
contract for future delivery on or subject to the rules of any registered entity, to intentionally or
recklessly:(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or
artifice to defraud;(2) Make, or attempt to make, any untrue or misleading statement of a
material fact or to omit to state a material fact necessary in order to make the statements made
not untrue or misleading;(3) Engage, or attempt to engage, in any act, practice, or course of
business, which operates or would operate as a fraud or deceit upon any person …." 17 C.F.R. §
180.1(a).

loans, and the purchases." *Hunter Wise*, 21 F. Supp. 3d at 1338.  However, Hunter Wise "failed to inform the parties that the metals it purchased were on a financed basis, it did not own the metals, and the metals, if there were any at all, were not in the retail customers' names." *Hunter Wise*, 21 F. Supp. 3d at 1338.

Additionally, Hunter Wise "pocketed the interest Hunter Wise charged customers for loans it agreed to, but never did, provide, as well as the fees it charged for the storage of metals that did not exist." *Hunter Wise*, 21 F. Supp. 3d at 1338.  "Hunter Wise did not inform its clients how it was using the funds it received. Instead of applying the funds to pay off interest on real loans or buying and storing metals, Hunter Wise used the funds to offset its obligations .... Hunter Wise continued to charge interest and storage fees, even though the charges were for nonexistent services." *Hunter Wise*, 21 F. Supp. 3d at 1338.  The same is true in the instant action.

The CFTC has proven by a preponderance of the evidence that Southern Trust's statements were false.  There were no physical precious metals owned by customers and stored in depositories.  Nor were there any loans provided to or for the benefit of Southern Trust's customers.  Instead, Southern Trust transferred customer funds to Hantec and Berkeley, where Southern Trust engaged in margined derivatives trading in the name of Loreley.  This margined derivatives trading was designed to hedge Southern Trust's exposure to its customers' trading positions, not to obtain physical metals as the customers were told.

The CFTC has also proven by a preponderance of the evidence that Southern Trust mislead its customers by omitting material facts in connection with the transactions at issue. Southern Trust never disclosed to customers that their funds were being sent to Loreley, Hantec,

or Berkeley.  Southern Trust also never disclosed that those customer funds were being used to purchase derivative contracts in the UK rather than physical metals.

**B.      Materiality**

A representation or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment.  *R.J. Fitzgerald*, 310 F.3d at 1328-29.  The CFTC has shown by a preponderance of the evidence that Southern Trust's misrepresentations and omissions were material.

*Hunter Wise* provides guidance on the materiality of Southern Trust's misrepresentations and omissions.  In *Hunter Wise*, Judge Middlebrooks reasoned that, "[r]etail customers thought they were purchasing metals .... Undoubtedly, knowing that they were not buying [metals] would have been crucial information to have and to consider."  *Hunter Wise*, 21 F. Supp. 3d at 1346.  "Because Hunter Wise did not provide them with material information," Judge Middlebrooks held, "the retail customers entered into these investments blindly, without an accurate and complete picture of the transaction. *Hunter Wise*, 21 F. Supp. 3d at 1346.  Judge Middlebrooks's reasoning applies with equal force in the instant action.

Southern Trust customers believed that they were purchasing physical metals, and that those metals were a "hard asset" with "intrinsic value."  Southern Trust customers also believed they were paying interest on loans used to purchase those metals.

A reasonable customer would have found it material that no metals or loans existed, and that their money was being used to purchase derivative contracts, which were in accounts which were not in the customer's name, and held at companies located in the UK, after being passed through a BVI corporation.  *See, e.g.,* Transcript of Bench Trial, July 25, 2016  at 55:22-55:25 (Helfricht Testimony), 95:14-95:16 (Roach Testimony).

13

C.    **Scienter**

In its summary judgment order, this Court held that Mr. Escobio is the controlling person of Southern Trust.  DE 122 at 10-13.  As such, Mr. Escobio's scienter is imputed to Southern Trust for purposes of the CFTC's fraud claims. 17 C.F.R. § 1.2.

Scienter is established if the defendant "intended to defraud, manipulate, or deceive," or if the defendant's conduct represents "an extreme departure from the standards of ordinary care," i.e., recklessness. *R.J. Fitzgerald*, 310 F.3d at 1328-29.  Conduct involving "'highly unreasonable omissions or misrepresentations ... that present a danger of misleading [retail customers] which is either known to the Defendant or so obvious that [the] Defendant must have been aware of it' have been found to meet the scienter requirement." *Hunter Wise*, 21 F. Supp. 3d at 1339 (quoting *R.J. Fitzgerald*, 310 F.3d at 1328-29).

Mr. Escobio knew, or was reckless in not knowing, that Loreley was not purchasing physical metals via Hantec or Berkeley.  The Hantec and Berkeley account opening documents make clear that Loreley was trading in margined derivative contracts, and had no right to any physical metals.  CFTC Ex. 23, at 5; CFTC Ex. 133, at 3; CFTC Ex. 8 at 2-3.  Mr. Escobio reviewed and signed these account opening documents.   Transcript of Bench Trial, July 27, 2016  at 8:14-8:19, 12:18-12:21 (Escobio Testimony).  Mr. Escobio received Loreley's monthly account statements from Hantec and Berkeley at his email account. Transcript of Bench Trial, July 27, 2016  at 9:6-9:9, 14:2-14:7 (Escobio Testimony).  These accounts statements show trading in margined derivative contracts, not physical metals.  CFTC Exs. 128, 129. Mr. Escobio also knew that the accounts at Hantec and Berkeley were in the name of Loreley and not in the names of Southern Trust's customers.  Transcript of Bench Trial, July 26, 2016  at 198:21-199:7 (Escobio Testimony), 199:23-24; CFTC Ex. 8.

Mr. Escobio had no basis to believe that Hantec or Berkeley was providing loans. Neither the account opening documents nor the monthly statements from Hantec or Berkeley show the existence of any loans or the charging of any interest. CFTC Exs. 8, 23, 128, 129. Mr. Escobio understood that the interest rate was determined by the Southern Trust brokers. Transcript of Bench Trial, July 27, 2016 at 24:4-24:6 (Escobio Testimony). The "loans" were simply an artifice used by Southern Trust as a pretext for charging customers more money.

### 1.    Verbal Assurances from Hantec and Berkeley

Mr. Escobio's unlikely story is that he is the one who was defrauded, that he was duped by Hantec and Berkeley into believing that Loreley was buying physical metals. Mr. Escobio claims that Mr. Nurmohamed, the CEO of Hantec, showed him a "holding statement" showing physical gold owned by Hantec and stored at Standard Chartered Bank and Barclays. Transcript of Bench Trial, July 26, 2016 at 188:13-189:5, 192:2-192:9 (Escobio Testimony). However, Mr. Escobio failed to obtain a copy of this holding statement, and never followed up with Standard Chartered or Barclays to confirm that Hantec stored metals there for its customers. *Id.* at 188:13-188:19, 193:19-193:22, 194:8-194:14,194:21-194:23. Furthermore, Mr. Nurmohamed testified that he never told Mr. Escobio that Hantec stores physical metals at Standard Chartered or Barclays, and that he never showed Mr. Escobio any "holding statement." Hantec Dep. at 58:13-58:18.

Mr. Escobio has a similar story with respect to Berkeley. Mr. Escobio claims that he met four times, once in the Bahamas and three times in London, with Berkeley personnel including Christopher Thompson, Berkeley's Managing Director. Each time, Mr. Escobio claims, they assured him that Loreley was buying physical metals. Transcript of Bench Trial, July 25, 2016 at 3:12-3:24 (Escobio Testimony); Transcript of Bench Trial, July 27, 2016 at 4:4-4:16; 5:4-5:18

(same). Once again, Mr. Escobio failed to procure any documents or written confirmation from Berkeley evidencing the ownership or storage of physical metals. Transcript of Bench Trial, July 26, 2016 at 193:19-193:22 (Escobio Testimony). Mr. Thompson testified that he met with Mr. Escobio only once, in 2011 when Mr. Escobio came to open the account. Berkeley Dep. at 10:18-10:22. Furthermore, Mr. Thompson testified that he never told Mr. Escobio that Loreley was trading physical metals. Berkeley Dep. at 80:16-81:11.

The Court does not credit Mr. Escobio's testimony. Mr. Escobio knew from the account opening documents and the monthly account statements, which he continued to receive, that Loreley was trading margined derivative contracts. Even if the Court were inclined to believe Mr. Escobio's story about the verbal assurances he claims to have received, it would be unreasonable for him to have relied on those assurances in light of the account opening statements he reviewed and signed which plainly state Loreley was trading derivative contracts with "no legal right" to the underlying asset. Moreover, it is not believable that Mr. Escobio would have sent millions of dollars in customer funds to Hantec and Berkeley for the purchase of physical silver based on nothing more than verbal assurances from his counterparties during meetings that Mr. Escobio cannot corroborate with any documentation, and which Hantec and Berkeley both deny making.

### 2.    The November 18, 2011 Letter from Hantec

Mr. Escobio points to a one-sentence letter he received via email from Hantec, dated November 18, 2011, as proof of his lack of scienter. The circumstances surrounding this letter support rather than rebut an inference of scienter.

The letter states only that "any Gold or Silver you purchase from us is held for your account and upon full payment we are able to arrange delivery for you when requested." Def.

16

Ex. 49. It does not state that Southern Trust was trading physical metals, or that such metals are transferred or delivered with each trade.

The letter is dated almost a year after Mr. Escobio first opened the account. *Compare* Def. Ex. 49, *and* CFTC Ex. 23. Mr. Escobio asked Hantec to write this letter after Southern Trust brokers expressed concern about Dodd-Frank's requirement that leveraged metals be delivered within 28 days of purchase. Transcript of Bench Trial, July 26, 2016 at 195:9-195:14, 201:17-201:18 (Escobio Testimony); CFTC Ex. 34.

Mr. Nurmohamed testified that in 2011 Mr. Escobio asked him whether Hantec could deliver metal if it had to. Hantec Dep. at 52:19-54:10. Mr. Escobio assured Mr. Nurmohamed that it was "highly unlikely" he would ever need to take delivery. Hantec Dep. at 52:19-54:10, 71:18-71:24. Mr. Nurmohamed told Mr. Escobio that Hantec had never delivered metal before, but that Standard Chartered Bank could arrange for delivery if Hantec opened an account there. Hantec Dep. at 52:19-54:10, 71:7-71:17. Mr. Nurmohamed never opened an account at Standard Chartered, and Mr. Escobio never asked him to. Hantec Dep. at 54:11-54:15, 57:25-58:3.

It is clear that Mr. Escobio knew Loreley's accounts at Hantec and Berkeley did not contain physical metals. Nonetheless, Mr. Escobio used, and continues to use, Hantec's letter to try and convince regulators and the Court that Southern Trust was satisfying the delivery requirement. As this Court has already held, however, that requirement was not satisfied, and there is no evidence of any delivery of physical metals. DE 122 at 9.

### 3.     The April 2013 Emails from Hantec and Berkeley

Mr. Escobio points to two emails from April 2013 as further proof that he believed Hantec and Berkeley were selling physical gold and silver. In the first email, dated April 15, 2013, Mr. Nurmohamed wrote: "I can confirm that you hold accounts with us that only trade

Silver Bullion." CFTC Ex. 103. In the second email, dated April 22, 2014, a representative of Berkeley writes: "I can confirm that all Loreley accounts with the prefix X1LOR were silver bullion accounts. These accounts only traded in OTC silver bullion and never traded in any futures contracts." CFTC Ex. 104.

During his testimony, Mr. Escobio emphasized the word "bullion" in these emails, claiming the use of the word "bullion" is proof he was dealing in "physical gold bars or ingots or the physical silver bars or ingots." Transcript of Bench Trial, July 26, 2016 at 187:17-188:12. However, the emails make no reference to physical metal, storage, depositories, or delivery, and Mr. Nurmohamed and Mr. Thompson both testified that the reference to "bullion" in the letters was shorthand for the margined derivative contracts that Loreley traded. Hantec Dep. at 77:1-77:7; Berkeley Dep. at 98:1-98:15, 100:3-100:7. Moreover, the Hantec product disclosure statement and Berkeley account opening documents make it clear that Loreley's "bullion" trading was in derivative contracts, with "no legal right" to the underlying asset.

Mr. Escobio asked Hantec and Berkeley to write these emails after the National Futures Association—the futures industry self-regulatory organization— began investigating Southern Trust. Transcript of Bench Trial, July 26, 2016 at 209:18-210:6 (Escobio Testimony). Mr. Escobio did this "because of the questions that the NFA was asking and asking for us to provide proof that, in fact, we were doing bullion." *Id.* at 209:18-210:6 (Escobio Testimony). "[O]n that letter he specially said 'bullion," Mr. Escobio testified, "which is what I wanted to hear." *Id.* at 187:17-188:12 (Escobio Testimony).

Like the November 18, 2011 letter, the April 2013 emails were an attempt by Mr. Escobio to mislead regulators into believing that Southern Trust was not acting as an unregistered futures merchant.

## V.  ROBERT ESCOBIO CONTROLLING PERSON LIABILITY

Section 13(b) of the Act provides that the controlling person of an entity is jointly and severally liable for that entity's violations of the Act.  7 U.S.C. § 13c(b).  As set forth above, the Court ruled on summary judgment that Mr. Escobio had general control over Defendants Southern Trust and Loreley.  DE 122 at 10-11.  Additionally, the Court found Mr. Escobio failed to act in good faith, and knowingly induced Southern Trust's off-exchange retail leveraged commodities transactions.  *Id.* at 11-13.  These are the same transactions that form the basis for the CFTC's fraud claims.

As such, Mr. Escobio is the controlling person for Southern Trust with respect to the CFTC's fraud claims.  This conclusion is supported by the evidence at trial, which shows Mr. Escobio opened Loreley's accounts and Hantec and Berkeley, and was aware of Southern Trust's representations to customers.  Transcript of Bench Trial, July 26, 2016  at 179:21-180:3, 180:22-181:8, 183:22-184:13 (Escobio Testimony).  Mr. Escobio is liable as the controlling person of Southern Trust and Loreley for all four counts of the CFTC's Complaint.

## VI. RELIEF

The CFTC's Complaint seeks equitable relief pursuant to Section 6c of the Commodity Exchange Act, 7 U.S.C. § 13a-1, and also pursuant to this Court's own equitable powers. Section 6c of the Act authorizes the Court to order relief including an injunction, civil penalties, and restitution.

## A.      Permanent Injunction

Section 6c(b) of the Act provides that "upon a proper showing, a permanent . . . injunction . . . shall be granted without bond."  7 U.S.C. § 13a-1(b).  In evaluating whether to grant an injunction, the Court may consider the following factors:

19

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of
> the infraction, the degree of scienter involved, the sincerity of the defendant's
> assurances against future violations, the defendant's recognition of the wrongful
> nature of his conduct, and the likelihood that the defendant's occupation will
> present opportunities for future violations.

*Hunter Wise*, 21 F. Supp. 3d at 28, quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322

(11th Cir. 1982).

Defendants' violations of the Act were egregious. Defendants enticed customers to

invest funds to purchase physical metals, and instead took the money and engaged in complex

off-exchange derivatives transactions in anonymous, overseas trading accounts. The leveraged

metals scheme spanned several years, and involved at least 100 customers and thousands of

falsely misleading transactions. Victims of the Defendants' leveraged metals scheme lost $1.5

million dollars.

Defendants' futures scheme was no mere technical violation of the law. "Registration is

the kingpin in th[e] statutory machinery [of the Commodity Exchange Act], giving the

Commission the information about participants in commodity trading which it so vitally requires

to carry out its other statutory functions of monitoring and enforcing the Act." *Stotler & Co. v.

Commodity Futures Trading Comm'n*, 855 F.2d 1288, 1293 (7th Cir. 1988).

Mr. Escobio knew he was violating the Act when he engaged in the transactions at issue

in this case. Mr. Escobio testified that he's "been in the futures industry for 35 years," and he

has "handled some of the largest customers in the world," including "central banks" and "major

institutions." Transcript of Bench Trial, July 26, 2016 at 195:15-195:17. He was the Chief

Executive Officer and Chief Financial Officer of a publicly traded company, Southern Trust

Securities Holding Company, whose SEC filings extol the financial industry experience of its

executives and employees. CFTC Ex. 63. The principal subsidiary of this holding company was

Southern Trust Securities, "a registered broker-dealer with the SEC and a member of FINRA [and] the National Futures Association." CFTC Ex. 63 at 063-009. Given this experience and expertise, it was egregious to accept funds from customers to execute futures trades through Southern Trust, and it was egregious to disguise the trading of metals derivatives as the purchase and sale of physical metals on a leveraged basis.

There is a strong likelihood that unless enjoined, Mr. Escobio's occupation will present opportunities for future violations. Mr. Escobio remains an SEC and CFTC registrant. He remains involved in the operations of Southern Trust Securities and in that capacity has clear opportunities to engage in the same type of conduct at issue in this case. Unless enjoined, he is in a position to continue to work as he has in the past in the futures and securities markets, and to handle customer funds.

## B.    Restitution

Section 6c(d) of the Act provides that "the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including …[r]estitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)." 7 U.S.C. § 13a-1(d)(3). Restitution is appropriate for both the futures scheme and the leveraged metals scheme. Defendant's business was illegal from the outset. Southern Trust never should have accepted customer funds for the purpose of trading futures transactions without first registering as a futures commission merchant with the CFTC. Similarly, the Defendants never should have accepted funds in connection with off-exchange, leveraged retail commodity transactions. Under these circumstances Defendants' customers should be placed in the position they were in before the violations of the Act occurred. The

21

appropriate amount of restitution is the difference between the amount of funds invested by Southern Trust's customers, and the amount of funds those customers received back.

Restitution is also appropriate because Defendants' violations of the Act proximately caused their customers' losses.  The losses suffered by Defendants' customers were a reasonably foreseeable result of the Defendants' violations.  *See City of Miami v. Bank of America Corp.*, 800 F.3d 1262, 1282 (11th Cir. 2015) ("The defendant must have been reasonably able to foresee the kind of harm that was actually suffered . . .").  Defendants either pocketed customer funds directly, or placed their customers at the risk of losing money in illegal transactions.

Defendants argued at trial that their leveraged metals customers' losses were caused by a decline in the value of silver (the asset underlying the derivative contracts Defendants purchased) rather than the Defendants violations of the Act. However, a defendant who fraudulently induces another to participate in a transaction cannot blame market losses for his or her victims' losses. In *United States v. Turk*, 626 F.3d 743 (2d Cir. 2010), for example, a defendant who fraudulently induced investors to participate in a real estate transaction tried to blame the market downturn for his investors' losses.  The court rejected this argument, holding that the rule urged by defendant would "encourage would-be fraudsters to roll the dice on the chips of others, assuming all the upside benefit and little of the downside risk." *Id.* at 750; *see also United States v. McKanry*, 628 F.3d 1010, 1019 (8th Cir. 2011) ("the appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were reasonably foreseeable").  Defendant's argument that he should not be held accountable for losses caused by market factors because he never intended to lose the investors' monies is not logical.

Defendants obtained customers' funds through false pretenses—by telling customers their money would be used to purchase physical metals held in depositories. The fact that Defendants' customers' positions would have declined regardless of whether Defendants purchased physical silver (as they had promised to do) or derivatives contracts (as they actually did) is of no moment.

Defendants tricked customers into investing in metals derivatives. Defendants took their customers' money in connection with illegal, off-exchange retail commodity transactions. When the scheme was discovered in April 2013, Southern Trust liquidated the trading positions in its Loreley accounts and sent back the small amount remaining to customers. Defendants' victims did not know that their funds were being funneled through a British Virgin Island corporation to derivatives trading accounts in London. They did not know that Southern Trust was not purchasing or delivering any metals. They did not know that Southern Trust was engaging in illegal, off-exchange retail commodity transactions in violation of the Commodity Exchange Act. The appropriate restitution is the full amount of customer losses.

## C.    Civil Monetary Penalty

Section 6c(d)(1) of the Act provides that "the Court shall have jurisdiction to impose . . . on any person found in the action to have committed any violation, a civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. §13a-1(d)(1) (2006).[5] Factors to consider in assessing a civil monetary penalty include: the relationship of the violation at issue to the regulatory purposes of the Act and whether or not the violations involved core provisions of the Act; whether scienter was involved; the consequences flowing from the violations; financial benefits to a defendant; and

---

[5] The Regulations adjust the statutory civil monetary penalty for inflation. *See* 17 C.F.R. § 143.8.

harm to customers or the market. *In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467-8 (CFTC Dec. 10, 1996), *aff'd* 137 F.3d 1300 (11th Cir. 1998). "Conduct that violates core provisions of the Act's regulatory system—such as manipulating prices or defrauding customers should be considered very serious." *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir.1995) (quoting *In re Premex*, [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,165 at 34,890–91 (CFTC Feb. 17, 1988)).

This case warrants the imposition of a civil monetary penalty. The violations at issue were egregious, systematic, and calculated. District courts in the Eleventh Circuit have issued civil monetary penalties representing triple the monetary gain to defendants in comparable cases. *See, e.g., Hunter Wise*, 21 F. Supp. 3d at 1353; *CFTC v. International Monetary Metals*, Case No. 14-cv-62244-WJZ, p. 16  (August 1, 2016, J. Zloch). Defendants' monetary gain from the transactions at issue in this matter totals $1,125,096.[6] Upon consideration, the Court finds a civil monetary penalty of triple the monetary gain to Defendants would be excessive, given the entry of a permanent injunction against Defendants and the requirement that Defendants make full restitution to their victims. Accordingly, the Court shall impose a civil monetary penalty of $375,032 (one-third the monetary gain to Defendants).

## VII. CONCLUSION

The Court finds in favor of Plaintiff U.S. Commodity Futures Trading Commission and against Defendants on Counts II and III of the Complaint. Injunctive relief in the form of restitution, and a civil monetary penalty, are appropriate based on the findings and conclusions in this Order as well as those set out in this Court's April 7, 2016 Order granting the CFTC's

---

[6] The sum of the commissions charged in connection with the leveraged metals scheme and the commissions charged in connection with the unregistered futures sales. *See supra* Parts III(E)(1), (2).

24

Motion for Summary Judgment on Counts I and IV of the Complaint. *See* DE 122. Judgment, including the specific terms of the injunction and the amounts of restitution and civil monetary penalty, will be set out in a separate Final Judgment pursuant Federal Rule of Civil Procedure 58.

      **DONE AND ORDERED** in chambers at the James Lawrence King Federal Justice Building and United States Courthouse in Miami, Florida, this 29th day of August, 2016.

James Lawrence King
United States District Court Judge

cc: All counsel of record