**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 14-22739-Civ-KING/TORRES

U.S. COMMODITY FUTURES
TRADING COMMISSION,

      Plaintiff,

v.

SOUTHERN TRUST METALS, INC.,
LORELEY OVERSEAS CORPORATION,
and ROBERT ESCOBIO

      Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON PLAINTIFF'S MOTION FOR AN ORDER TO SHOW CAUSE WHY**
**ESCOBIO SHOULD NOT BE HELD IN CONTEMPT OF COURT**

This matter is before the Court on the U.S. Commodity Futures Trading Commission's ("Plaintiff") Motion for an Order to Show Cause ("Motion") on why Robert Escobio ("Escobio") should not be held in contempt of Court. [D.E. 195]. Escobio timely responded on March 21, 2017 [D.E. 200] to which Plaintiff replied on April 21, 2017. [D.E. 204]. The motion is thus ripe for disposition. The crux of the dispute centers primarily on the scope of equitable restitution available under the Commodity Exchange Act and whether a judgment awarding equitable restitution in this case may be enforced through the Court's contempt power. Escobio says no, arguing that the judgment in this case is limited to the particular collection process permitted by a different federal statute, the Federal Debt

Collection Procedures Act.   But based on our review of the relevant statutes, and pursuant to the broad scope of equitable restitution Congress expressly adopted in cases such as this, Plaintiff has the better side of the argument.

Therefore, after careful consideration of the Motion, response, reply and relevant authority, and for the reasons discussed below, Plaintiff's Motion should be **GRANTED in PART** and **DENIED in PART**.[1]   This Report and Recommendation is being entered to allow for resolution of any objections to our conclusion on this complex issue of law.   Assuming that the Court's Order to Show Cause issues, and if Escobio does not cure his current refusal to honor the Court's restitution judgment in the interim period, an evidentiary hearing will be set at a later date at which Escobio can demonstrate why a contempt finding should not be enforced.

## I.     BACKGROUND

The United States Commodity Future Trading Commission ("Plaintiff" or "CFTC") filed this action on July 23, 2014 against Southern Trust Metals, Inc. ("ST Metals"), Lorely Overseas Corporation ("Lorely"), and Robert Escobio.   The Complaint [D.E. 1] alleged that the Defendants by and through their officers, employees, and agents, operated a scheme in which defendants defrauded retail customers in connection with illegal, off-exchange, finance precious metals transactions.   The Complaint further alleged that defendants violated the Commodity Exchange Act (the "CEA") by acting as a futures commodity merchant ("FCM") without being registered with the Commission.

---

[1]     This matter was referred to the undersigned Magistrate Judge by the Honorable James Lawrence King on April 18, 2017.   [D.E. 201].

Count I alleged that ST Metals and Loreley violated the Act by offering, entering into, and executing off-exchange financed retail commodity transactions. Escobio was allegedly liable for ST Metals and Loreley's actions as a controlling person of ST Metals and Loreley.

Count II alleged that ST Metals made intentional and knowing misrepresentations to customers in off-exchange financed retail commodity transactions. Escobio was allegedly liable for ST Metals' actions as a controlling person of ST Metals.

Count III alleged that ST Metals further violated Commission Regulation 1801.1(a) by employing deceptive devices in the transactions referred to in Count I. Escobio was allegedly liable for ST Metals' actions as a controlling person of ST Metals.

Count IV alleged that ST Metals further violated the Act by acting as an FCM by (1) offering and executing financed retail commodity transactions and (2) accepting money for and placing future orders without being registered with the Commission as an FCM. Escobio was allegedly liable for ST Metals' actions as a controlling person of ST Metals.

On April 7, 2016, the Court granted partial summary judgment in favor of Plaintiff on Counts 1 and 4, and found Escobio liable as the controlling person of the corporate defendants. [D.E. 122]. The case proceeded to a three-day bench trial on Plaintiff's fraud claims (Counts II and III), and for the determination of remedies sought by Plaintiff on all counts. [D.E. 154-156]. On August 29, 2016, the Court

entered findings of fact and conclusions of law and ruled in favor of Plaintiff and against the Defendants.   [D.E. 166].

In those findings of fact and conclusions of law, the Court held that ST Metals defrauded its customers by misrepresenting that ST Metals was selling, and its customers were buying, physical precious metals stored in safe and secure vaults. *Id.*  ST Metals also misrepresented to customers that it was extending them loans to purchase metals, when no loans existed.   *Id.*   The Court found that Escobio was the controlling person of ST Metals and was therefore liable for its fraud.   *Id.*

On August 29, 2016, the Court entered a final judgment ordering Escobio to pay within ten days $2,103,617 in restitution and a $357,032 civil monetary penalty. The judgment also included a permanent injunction prohibiting all defendants from engaging in commodities trading in markets regulated by the Plaintiff.[2]

Plaintiff forwarded a copy of the final judgment to National Futures Association ("NFA"), the Court-appointed monitor for restitution.   *Id.* at 3.   A month after the judgment was entered, the NFA did not receive any payment from Defendants, or Escobio in particular, and wrote a letter to defense counsel instructing them as to how payment should be made.   There was purportedly no response.   The NFA sent another letter to Escobio's counsel, dated October 5, 2016, asking if Escobio intended to pay the Court-ordered restitution.   Escobio's counsel responded with a letter asserting that Escobio "has no financial ability to pay the

---

[2]   Though Escobio appealed that judgment to the Court of Appeals [D.E. 176], the judgment has not been stayed pending appeal under Fed. R. Civ. P. 62. [D.E. 184].

restitution award."   On December 6, 2016, Plaintiff sent Escobio's counsel a letter demanding payment of the final judgment, or, in the alternative, post-trial asset discovery.

Because no payment was received, Plaintiff served requests for production on Escobio, and took his deposition on February 24, 2017.   In the deposition, Escobio admitted that he was aware of the judgment against him.   He also admitted that he had not, at the time of the deposition, paid anything towards his restitution or civil monetary penalty obligation.   He promised to start making payments and claimed that he would make one as soon as he returned home.

But, to date, Escobio has only made a single payment of $500 towards his restitution obligation and no payment towards his civil monetary penalty.   Because Escobio has allegedly failed to comply with the final judgment, Plaintiff seeks an order to show cause on why Escobio should not be held in contempt of court.

## II.   ANALYSIS

Plaintiff's Motion seeks an order to show cause why Escobio should not be held in contempt for failing to pay within ten days $2,103,617 in restitution and a $357,032 for a civil monetary penalty.   There is no dispute that payment of the final judgment has been outstanding for more than six months.   Instead of complying, Plaintiff argues that Escobio has been enjoying a caviar lifestyle by spending thousands of dollars a month on credit card bills, fine dining, international travel, and new cars.   Because Escobio has flouted the Court's judgment and not made any effort to satisfy his obligations, Plaintiff requests an order to show cause.

In response, Escobio argues that Plaintiff's Motion is legally frivolous because the Federal Debt Collection Procedures Act (the "FDCPA") explicitly defines "restitution" and a "penalty" as debts enforceable exclusively under the Act's procedures, which do not allow for enforcement of the final judgment via contempt. Escobio further contends that Plaintiff knows from Escobio's cooperation in post-judgment discovery that Escobio is insolvent and has no ability to pay the large final judgment awarded against him.

### A.   *The Inherent Power of Contempt*

Courts generally have the inherent power to enforce compliance with their orders through civil contempt.   *See Shillitani v. United States,* 384 U.S. 364, 370 (1966).   Civil contempt is remedial because it serves to enforce compliance with a court order or to compensate an injured party.   *See In re Stewart,* 571 F.2d 958, 963 (5th Cir. 1978).   "In a civil contempt proceeding, the petitioning party bears the burden of establishing by 'clear and convincing' proof that the underlying order was violated."   *SEC v. Solow*, 682 F. Supp. 2d 1312, 1324–25 (S.D. Fla. 2010), *aff'd*, 396 F. App'x 635 (11th Cir. 2010) (citing *Newman v. Graddick,* 740 F.2d 1513, 1525 (11th Cir. 1984); *Piambino v. Bestline Products, Inc.,* 645 F. Supp. 1210, 1213 (S.D. Fla. 1986)).   Once a prima facie showing has been made that a court order was violated, the burden of production shifts to the opposing party to demonstrate a "present inability to comply that goes 'beyond a mere assertion of inability . . . .'"   *Combs v. Ryan's Coal Co., Inc.,* 785 F.2d 970, 984 (11th Cir. 1986) (quoting *United States v.*

*Hayes,* 722 F.2d 723, 725 (11th Cir. 1984)); *see also United States v. McAnlis,* 721 F.2d 334, 337 (11th Cir. 1983).

The initial focus of the Court's inquiry turns, not on the subjective beliefs or intent of the party bound by the order or judgment, but on whether in fact his conduct complied with their terms. *See Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of America,* 609 F.2d 165, 168 (5th Cir. 1980).   On the other hand, substantial compliance, even if not complete, may excuse a finding of contempt if performance is undertaken in good faith. *See Howard Johnson Co., Inc. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir. 1990).   An alleged contemnor may also avoid a finding of contempt by demonstrating an inability to comply with a court order. *Id.*; *United Student Aid Funds, Inc. v. Gary's Grading & Landscaping,* 2009 WL 161711 (M.D. Fla. 2009).   But, the inability defense is only met when a party has "'in good faith all reasonable efforts' to meet the terms of the court order he is seeking to avoid." *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (citations omitted); *see also Combs,* 785 F.2d at 984 ("We construe this requirement strictly.   'Even if the efforts he did make were 'substantial,' 'diligent' or 'in good faith,' . . . the fact that he did not make 'all reasonable efforts' establishes that [respondent] did not sufficiently rebut the . . . prima facie showing of contempt." (quoting *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984)). And, "[w]hile inability to pay is a defense to civil contempt, inability to pay is not a defense if the contemnor created the inability." *Solow*, 682 F. Supp. 2d at 1325

(citing *Hodgson v. Hotard,* 436 F.2d 1110, 1116 (5th Cir. 1971); *Piambino v. Bestline Products, Inc.,* 645 F. Supp. 1210, 1215 (S.D. Fla. 1986)).

Because the resolution of the current dispute turns largely on the source of the power of contempt in general, and on its application to the remedy of restitution in particular, an understanding of their historical origins is necessary.

### B.   *Origins of the Power of Contempt and Restitution*

A federal court's inherent contempt power traces back historically to the early days of the English crown, which used the contempt power as a vehicle for assuring efficiency and respect for the sovereign.   Specifically, disobedience of a writ under the King's seal was deemed "contempt."   *See Green v. United States*, 356 U.S. 165, 169 (1958).   When viewed as a legal doctrine, the offense of contempt became a part of the English common law and, subsequently, an inherent part of Anglo-American legal doctrine.   *See id*.   That doctrine extended both to courts at law of general jurisdiction, as well as courts of equity or chancery that were deemed to have the same inherent power as courts of law to punish for contempt in part as a coercive measure to enforce the chancery court's decrees.   *See, e.g., South Dade Farms, Inc. v. Peters,* 88 So. 2d 891, 899 (Fla. 1956) ("This court very early in its history in some measure recognized the inherent [contempt] power of a court of equity to assess damages in favor of an injured party to be paid by a party violating a decree.").

And that was true for both federal courts as well as state courts.   "The moment the courts of the United States were called into existence and invested with

jurisdiction over any subject, they became possessed of this power." *Ex parte Robinson,* 86 U.S. 505, 510 (1873).

Consequently, from the Constitution's inception, federal courts were imbued with "power to punish for contempts [that] is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." *Id.* Hence it is settled centuries that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson,* 11 U.S. 32, 34 (1812); *see also Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980) (citing *Hudson*). This is why "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 19 U.S. 204, 227 (1821); *see also Robinson*, 86 U.S. at 510. These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630–631 (1962).

The contempt power is thus purposefully broad to cover a full range of litigation abuses:

> [O]ther mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, where as each of the other mechanisms reaches only certain individuals or conduct, the inherent

> power extends to a full range of litigation abuses.   At the very least, the inherent power must continue to exist to fill in the interstices . . . [T]he inherent power of a court can be invoked even if procedural rules exists which sanction the same conduct . . . [A] federal court [is not] forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules.

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 46-50 (1991) (internal quotations omitted).

Though that power is broad in scope, it is not unlimited.   Congress "left to the court ample power to protect the administration of justice against immediate interruption of its business," and "intended to safeguard constitutional procedures by limiting the contempt power to the least possible power adequate to the end proposed."   *Carlson v. United States*, 209 F.2d 209, 215 (1st Cir. 1954).   Thus that federal contempt power was recognized to have limits proscribed by Congress that were consistent with the Constitution.   *Id*. at 511 (citing Judiciary Act of 1789, § 17, 1 Stat. 83; An Act Declaratory of the Law Concerning Contempts of Court, 4 Stat. 487).

The "power of a court to coerce performance of [a] legal duty is equitable in character."   *United States v. Yates*, 107 F. Supp. 412, 414 (S.D. Cal. 1952) (citing *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 451 (1911); *Bessette v. W. B. Conkey Co.*, 194 U.S. 324, 327-29 (1904)).   "It exists for an equitable purpose, and duration of the power in a given instance is co-extensive with existence of the purpose."   *Yates*, 107 F. Supp. at 414 (citations omitted).   As such, the power of contempt flows historically from a court of equity and remains as an inherent power in the present as "necessary to the exercise of all other[ ] powers."   *Chambers,* 501

U.S. at 57; *see also Shillitani,* 384 U.S. at 370 ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.").   Consequently the remedies available to a court of equity also vested in the federal courts.   *See, e.g., United States v. Keyspan Corp.*, 763 F. Supp. 2d 633, 639 (S.D.N.Y. 2011) ("'[B]ecause chancery courts possessed the power to order equitable disgorgement in the eighteenth century . . . contemporary federal courts are vested with the same authority by the Constitution and the Judiciary Act.'") (quoting *SEC v. Cavanagh*, 445 F.3d 105, 120 (2d Cir. 2006)).

Just as the power of contempt available to the federal courts is rooted in equitable principles, so too is it firmly established that the power to grant restitution is also founded on equitable principles.   *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212-213 (2002); *First Nat'l Life Ins. Co. v. Sunshine–Jr. Food Stores, Inc.,* 960 F.2d 1546, 1553 (11th Cir. 1992) (determining in an ERISA suit that "[r]estitution is an equitable remedy designed to restore to a plaintiff something of value that is wrongfully in the possession of another."); *Blood v. Fleming*, 161 F.2d 292, 296 (10th Cir. 1947) ("In equity, restitution is ordered upon the principle that a court of equity will order one to do what in good conscience he should do."); *see also* Tracy A. Thomas, *Justice Scalia Reinvents Restitution*, 36 Loy. L.A. L. Rev. 1063, 1077–78 (2003) ("[T]he court's contempt power . . . made enforcement of the remedy more effective and efficient"); *Matter of Grand Jury Proceedings Empanelled May 1988*, 894 F.2d 881, 884 (7th Cir. 1989) ("[C]ivil contempt—an ingenious method of coercion—originated, like so many other devices operating on the person directly

rather than on his assets, in equity, as a device for enforcing compliance with equitable decrees.") (citations omitted).

"However, not all relief falling under the rubric of restitution [wa]s available in equity.   In the days of the divided bench, restitution was available in certain cases at law, and in certain others in equity."   *Knudson*, 534 U.S. at 212.   As the Supreme Court determined, legal restitution arose when a judgment imposed personal liability on a defendant to pay money damages:

> In cases in which the plaintiff could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him, the plaintiff had a right to restitution *at law* through an action derived from the common-law writ of assumpsit.   In such cases, the plaintiff's claim was considered legal because he sought to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money.   Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).

*Id*. at 213 (internal citations and quotation marks omitted).

By contrast, equitable restitution arose in the form of a constructive trust or equitable lien.   "A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner."   *Id*. at 214.   Therefore, a court of equity enforced restitution if the action sought, not to impose personal liability, but rather to restore to a plaintiff his funds or property in a defendant's possession.   *See id*. at 215.

Of particular relevance here is the fact that, because equitable restitution is derived from a court of equity, courts have historically enforced that remedy via the

power of contempt. *See FTC v. BlueHippo Funding, LLC*, 2017 WL 1162201, at *4 (S.D.N.Y. Mar. 28, 2017) (finding that equitable restitution is a method of recovery "which is available through contempt damages"); *Perez v. Bruister*, 2017 WL 52644, at *3 (S.D. Miss. Jan. 4, 2017) (finding that equitable restitution "awards may be enforced by contempt.") (citing *Chesemore v. Fenkell*, 829 F.3d 803, 817 (7th Cir. 2016) ("It's well established that an equitable decree of restitution in an ERISA case may be enforced by contempt.")); *Ecopetrol S.A. v. Offshore Exploration & Prod. LLC*, 172 F. Supp. 3d 691, 697 (S.D.N.Y. 2016) ("In cases where contempt is appropriately imposed for the violation of courts' orders to render payment, the reliefs are usually the kinds that are traditionally available in equity") (citations omitted); *cf. United States v. McClamma*, 146 F. App'x 446, 449 (11th Cir. 2005) (finding that the district court did not abuse its discretion in holding the defendant in contempt for failing to make restitution payments pursuant to a guilty plea for mail fraud and false statements to a banking institution).

Like equitable restitution, the power of contempt also applies to other forms of equitable relief. *See, e.g., Tauro v. Allegheny Cty.*, 371 F. App'x 345, 348 (3d Cir. 2010) (child support); *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55 (2d Cir. 1984) (back pay pursuant to section 17 of the Fair Labor Standards Act); *Cleveland Hair Clinic, Inc. v. Puig*, 106 F.3d 165, 166 (7th Cir. 1997) (sanctions for misconduct); *SEC v. Zubkis*, 2003 WL 22118978, at *7 (S.D.N.Y. Sept. 11, 2003) (disgorgement); *SD Prot., Inc. v. Del Rio*, 587 F. Supp. 2d 429, 434–36 (E.D.N.Y. 2008) (sanctions for misconduct).

Therefore, there is ample authority that a remedy traceable to a court of equity, including equitable restitution, is enforceable by the power of contempt. And that power is intensified in cases, like this one, where equitable restitution is necessary to further the public interest.   The Supreme Court recognized as much in a case applying a different consumer regulation statute, the Emergency Price Control Act (the "EPCA").   *See Porter v. Warner Holding Co.*, 328 U.S. 395, 399 (1946).   That decision relied on the historical origins of equitable remedies in interpreting the EPCA so as to allow the Administrator to seek an order enjoining violations of the statute, as well as an an order enforcing compliance with its provisions.   "[U]pon a showing by the Administrator that [any] person has engaged or is about to engage in" violations of the EPCA, a court had the power to grant "a permanent or temporary injunction, restraining order, or other order."   *Id.* at 397. The Court held that the jurisdiction of the EPCA was equitable in nature and "[u]nless otherwise provided by statute all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *Id.* at 398.

The Court also found that a court's equitable powers assume a broader and more flexible character when an action involves the public interest.   As such, the Court determined that restitution "lies within that equitable jurisdiction" and "is within the recognized power and within the highest tradition of a court of equity." *Id.* at 402.   And as the Court made clear, absent a clear legislative command to the contrary, a district court's equitable powers are far-reaching:

> Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command.  Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.

*Id*. at 398 (internal citations omitted).

We conclude from this historical perspective that our jurisprudence firmly establishes that courts of equity, including federal courts, are empowered to impose equitable restitution and enforce that remedy, if necessary, through the power of contempt.  At the same time, however, we must still determine whether the relief Plaintiff seeks under the Court's inherent contempt power extends in fact to an equitable remedy that is part and parcel of this particular CEA judgment.   And to answer that question we must focus on the relevant statutory provisions that are relevant to this dispute.

### C.    *The Relevant Statutory Authority*

Plaintiff contends that, under the plain language of the CEA, judgments for restitution are equitable remedies and therefore fall within the scope of a court's contempt power. Defendant counters that the enforcement of a judgment awarded pursuant to the CEA does not alter the general restrictions found in the FDCPA that preclude the use of contempt to enforce this money judgment.   We turn first to the CEA.

### 1.    *The Commodities Exchange Act*

Plaintiff relies on the CEA enforcement provision that grants the Commission the power to seek equitable remedies, expressly including restitution, to persons who

have sustained losses due to violations of the CEA.   The statute specifically provides:

> (3) Equitable remedies
>
> In any action brought under this section, the Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including—
>
> (A)  restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and
>
> (B) disgorgement of gains received in connection with such violation.

7 U.S.C. § 13a-1(d)(3).

Both "disgorgement" and "restitution" are thus codified in section 13a-1, which broadly authorizes Plaintiff to bring civil actions in federal court to enjoin violations of the CEA or "to enforce compliance with this chapter" and to provide courts with "jurisdiction to entertain such actions."   7 U.S.C. § 13a-1(d)(1).   Plus, significantly, the most recent amendments to the CEA expressly extended the scope of equitable restitution, in response to limitations imposed on restitutionary remedies in earlier decisions.   *See, e.g., CFTC v. Trader's Int'l Return Network*, 2013 WL 757770, at *2 n.3 (M.D. Fla. Jan. 22, 2013) (recognizing that section 6c of the CEA was amended to explicitly authorize the CFTC to seek "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses).").

Importantly, "[u]nder § 13a–1(b), the court may issue an injunction or restraining order without bond; under § 13a–1(c), entitled 'Writs or other orders,' the court may issue 'writs of mandamus, or orders affording like relief . . . including the requirement that such person take action as is necessary to remove the danger of

violation' of the CEA." *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1343 (11th Cir. 2008).   Because Plaintiff's complaint seeks restitution to make "whole each and every customer whose funds were received or utilized by [defendants] in violation of the provisions" of the CEA, Plaintiff contends that there is no doubt that, pursuant to the express terms of the statute, the relief sought is equitable in nature and subject to the Court's contempt power.

On its face, the provisions of the CEA support Plaintiff's conclusion that the award of money damages in this judgment, at least with respect to the equitable restitution component of the judgment, falls squarely within the equitable powers that the Court has always had to enforce its judgment and decrees.   Congress codified the traditional equitable remedy of restitution in the statute as a means of redressing violations of the CEA.   And the judgment here may be enforced with all the traditional equitable powers that the Court possesses, including the power of contempt if necessary.

### 2.   The Federal Debt Collection Practices Act

In response, Escobio argues that Plaintiff's Motion is legally baseless because the FDCPA precludes the Court from using its contempt powers to enforce the final judgment against him, in part, because the monetary portion of the final judgment is a money judgment and constitutes an action grounded in law – not equity.   And Escobio concludes that the specific remedies provided for by the FDCPA preclude applying the CEA's remedial statutes in a manner inconsistent with the FDCPA's limitations.   So the powers of contempt do not apply here.

The FDCPA provides "the exclusive civil procedures for the United States" to obtain satisfaction of a debt in a proceeding that imposes a "fine, assessment, penalty, [or] restitution" in favor of the government.   28 U.S.C. §§ 3001(a)(1), 3002(3)(B)(8).   The underlying purpose of the FDCPA is to facilitate debt collection. *See* Seth S. Katz, *Federal Debt Collection Under the Federal Debt Collection Procedures Act: The Preemption of State Real Estate Laws,* 46 Emory L.J. 1697, 1699 (1997).   It was meant to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).   "Before the FDCPA's enactment, the government's collection efforts 'proceeded in the same manner as any other creditor pursuant to the law of the state where the judgment was issued,'" which led to widespread inefficiency in collecting billions of dollars pursuant to a multitude of different state laws.   *United States v. Badger*, 818 F.3d 563, 573 (10th Cir. 2016) (citation omitted).

Escobio relies on the definition of "debt" under the FDCPA, which in relevant part is "an amount that is owing to the United States on account of a   . . . penalty, restitution . . . or other source of indebtedness to the United States . . . ."   28 U.S.C. § 3002(3)(B).   Because restitution and a civil monetary penalty are expressly incorporated into the statute's definition of a "debt", Escobio contends that the FDCPA, not a court's traditional equitable or contempt powers, must control.   And that means that the FDCPA precludes an order enforcing this money judgment –

that undeniably encompasses sums for restitution and a civil monetary penalty – through the power of contempt.

Significantly, the debt collection procedures outlined in the statute are deemed "exclusive" under the statute, 28 U.S.C. §§ 3001(a)(1).  But a relevant exception to this principle is limitation found in the Rules of Construction provision, section 3003(b)(2), that clarifies that the FDCPA does not "curtail or limit the right of the United States under any other Federal law or any State law . . . to collect any fine, penalty, assessment, restitution, or forfeiture arising in a criminal case."  *Id.* § 3003(b)(2).  Moreover, the next subsection adds that "This chapter shall not be construed to supersede or modify the operation of . . . (7) any Federal law authorizing, or any inherent authority of a court to provide, injunctive relief; (8) the authority of a court . . . (C) to exercise the power of contempt under any Federal law; . . . ."  *Id.* § 3003(c).

Escobio concludes that these Rules of Construction do not help Plaintiff's cause because the FDCPA does not curtail the *right* to seek restitution, only the manner in which it is pursued.  Escobio also argues that the limitation for the exercise of contempt power in subsection 3003(c)(8) does not apply because the money judgment here does not traditionally give rise to a contempt remedy.  Escobio thus concludes that any civil restitutionary judgment the United States seeks to enforce is subject to the collection methods required by the FDCPA, no matter what the CEA would otherwise allow.

To reconcile these different remedial provisions, and specifically the apparent conflict between the broad restitutionary remedies codified in the CEA juxtaposed against the inclusion of "restitution" as a "debt" subject to the FDCPA, it is important to define what equitable restitution means under the CEA.

### D.    *Scope of Equitable Restitution under the CEA*

To define the scope of equitable restitution under the CEA, the Court must first turn its attention to the Eleventh Circuit's 2008 decision in *CFTC v. Wilshire*, 531 F.3d at 1342-45, where the Commodity Futures Trading Commission filed a similar action against similar parties for violations of the CEA but sought, unsuccessfully, an equitable restitution remedy.   We note, however, that the impact of that decision has been materially altered by legislative amendments to the CEA that are significant in this case, which amendments we will also discuss below.

### 1.    Wilshire *Limited the Scope of Equitable Restitution under the CEA*

The appellants in *Wilshire* argued that the remedies available under the CEA were limited solely to the text of the statute – i.e. injunctions, writs of mandamus or orders affording life relief, and civil penalties.   Hence, "restitution" was not viable under the CEA.   The Eleventh Circuit disagreed and reasoned that, although restitution did not appear in the statute itself, the "unqualified grant of statutory authority to issue an injunction under § 13a–1 carries with it the full range of equitable remedies, among which is the power to grant restitution."   *Id.* at 1343. The Eleventh Circuit also compared the broad equitable power available in the CEA to those recognized for other statutes like the FTCA, concluding that both statutes

were similar in scope because they both provide expansive equitable remedies including "the power to grant restitution and disgorgement."  *Id.* (citing *Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996) (quotations omitted)).

Like Escobio here, appellants in *Wilshire* alternatively argued that awarding restitution based on the amount of the customer loss was a legal remedy and thus outside the equitable powers of the CEA.  That argument proved to be more successful as the Eleventh Circuit criticized the district court's equitable remedy because it did not comply with the statutory language of § 13a–1 under the CEA.  Specifically, "the award was not based on the amount of money that Appellants wrongfully gained by their misrepresentations," but "it was based on the amount of money that the customers lost."  *Wilshire*, 531 F.3d at 1343.  That conclusion led the Eleventh Circuit to hold that the district court abused its discretion because "[t]he equitable remedy of restitution does not take into consideration the plaintiff's losses, but only focuses on the defendant's unjust enrichment."  *Id.* (citing *Waldrop v. Southern Co. Servs., Inc.*, 24 F.3d 152, 158 (11th Cir. 1994) (defining restitution as "an equitable remedy designed to cure unjust enrichment of the defendant absent consideration of the plaintiff's losses.")).

*Wilshire* further explained that this limitation on equitable restitution under the CEA was consistent with other circuits.  For example, the Third Circuit had previously found that an award of restitution under Section 13 of the CEA – measured in the amount of customer losses – was improper.  *See CFTC v. American*

*Metals Exch. Corp.,* 991 F.2d 71, 76–79 (3d Cir. 1993).   According to the Third

Circuit, a court's equitable powers under the CEA must be remedial:

> [A]n award of damages in the amount of investor losses may go beyond
> the scope of a [CEA] enforcement proceeding.   Absent a hearing to
> calculate ill-gotten gains, the disgorgement ordered in an amount equal
> to investor losses could be a penalty assessment.   If investors wish to
> seek recovery of their losses as a remedy, they are free to do so in an
> independent civil action against defendants.   The hardship of investor
> losses should not, however, be used as an excuse to impose a remedy
> under circumstances in which the scope of relief falls outside that
> remedy's recognized parameters.

*Id.*; *accord FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 66–68 (2d Cir. 2006) (determining

that "the appropriate measure for restitution is the benefit unjustly received by the

defendants[,]" not the amount of the customer loss); *Ellett Bros., Inc. v. U.S. Fidelity*

*& Guar. Co.,* 275 F.3d 384, 388 (4th Cir. 2001) ("Restitution and disgorgement

require payment of the defendant's ill-gotten gain, not compensation of the plaintiff's

loss.").   Therefore, *Wilshire* held that any equitable restitution that flowed from the

CEA could not include the full amount of customer losses because the proper

measure of relief was strictly the amount defendants wrongfully gained from their

misrepresentations.

### 2.   *Post-*Wilshire *Amendments to the CEA*

After the decision in *Wilshire*, Congress enacted the Dodd-Frank Wall Street

Reform and Consumer Protection Act of 2010 ("Dodd-Frank") that *expanded* the

enforcement authority of the Commodity Futures Trading Commission through

various amendments to the CEA.   *See* Dodd–Frank Wall Street Reform and

Consumer Protection Act, PL 111–203, July 21, 2010, 124 Stat 1376 (effective July

16, 2011).   Significantly, the amendments expanded the definition of equitable restitution to "persons who have sustained losses proximately caused by such violation (in the amount of such losses) . . . ."   7 U.S.C. § 13a-1(d)(3).

Since these amendments were enacted, the Eleventh Circuit has not revisited the revised statutory language of the CEA in relation to the scope of equitable restitution or its effect on *Wilshire*.   Yet, the Sixth Circuit, in dicta, addressed this in part and questioned "the claim that the CEA only authorizes an award of restitution when the defendant was unjustly enriched or possessed identifiable funds subject to a constructive trust or lien is untenable."   *CFTC v. Miklovich*, 2017 WL 1403194, at *3 (6th Cir. Apr. 19, 2017).   Such a view would "be nonsensical" because it "would contradict that restitution may be awarded to persons who sustained losses proximately caused by a violation of the CEA 'in the amount of such losses.'"   *Id*. In other words, an interpretation of the CEA that measured the relief of equitable restitution in terms of wrongful gains – rather than customer losses – would run contrary to the plain language of the statute.   The Sixth Circuit's position comports with at least one other court that "has held that the plain meaning of § 13a-1(d)(3)(A) authorizes the CFTC to seek restitution for persons who sustained losses proximately caused by the proven violations."   *Id*. (citing *CFTC v. U.S. Bank, N.A.*, 2014 WL 6474183, at *36 (N.D. Iowa Nov. 19, 2014) (denying the defendant's motion for summary judgment on the CFTC's request for restitution in the amount of customer losses under § 13a-1(d)(3)(A)).

The Sixth Circuit's reasoning in *Miklovich* is further supported by several canons of construction.   In the Eleventh Circuit, "'[t]he starting point in statutory interpretation is the language of the statute itself.'"   *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) (quoting *Ardestani v. INS,* 502 U.S. 129, 135 (1991) (internal quotation marks and alterations omitted)).   "If the 'language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case,' and 'the statutory scheme is coherent and consistent,' the inquiry is over." *Warshauer*, 577 F.3d at 1335 (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997) (internal quotation marks omitted)).   "In determining whether a statute is plain or ambiguous, we consider 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Warshauer*, 577 F.3d at 1335 (quoting *Robinson*, 519 U.S. at 341).

Here, the post-*Wilshire* version of the statute could not be clearer that Congress expanded the meaning of equitable remedies under the CEA to include "the amount of such losses."   7 U.S.C. § 13a-1.[3]   This conclusion is reinforced when § 13a-1(d)(3)(A) is read in conjunction with the "equitable remedies" provided for in § 13a-1(d)(3)(B), which   subsection   separately   authorizes   the   court   to   order "disgorgement of gains received in connection with such violation."

---

[3]      Before the congressional amendments in 2010 that specifically included the relief of equitable restitution, the Eleventh Circuit in *Wilshire* found that the unqualified grant of statutory power to issue an injunction carried with it the full range of equitable remedies – including restitution.   This is a significant difference between the CEA as interpreted in *Wilshire* and the statute today.   Unlike prior iterations of the CEA, the statute today clearly provides for equitable restitution in the text itself and defines that relief as measured on the basis of a customer loss.

### 3.    The CEA Incorporates the Power of Contempt

Nevertheless, the question that still must be answered is whether this expanded congressional authorization of equitable restitution is subject to the Court's contempt power.   In light of the statutory change in the CEA that allows for the recovery of restitution "in the amount of such losses," we conclude that the amended restitution provision falls well within the Court's contempt power because the expansion of equitable power was provided by Congress.[4]   That is significant, as the Supreme Court explained in *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 332 (1999).   This decision called upon the Court to consider the outer limits of Congress's power to expand the scope of equitable remedies.   The Court recognized that the equitable powers provided under the Judiciary Act of 1789 did not include the power to craft any weapon under the law and to devise remedies previously unknown to equity jurisprudence.   In reaching that conclusion, the Court relied on the remarks of Justice Joseph Story:

> If, indeed, a Court of Equity in England did possess the unbounded jurisdiction, which has been thus generally ascribed to it, of correcting, controlling, moderating, and even superceding the law, and of enforcing all the rights, as well as charities, arising from natural law and justice, and of freeing itself from all regard to former rules and precedents, it would be the most gigantic in its sway, and the most formidable instrument of arbitrary power, that could well be devised.

*Id.* at 332-33 (quoting 1 *Commentaries on Equity Jurisprudence* § 19, at 21) (quotation marks omitted).

---

[4]    Specifically, Congress crafted the CEA and "exercised its power under the commerce clause to regulate commodity trading."   *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 673 (N.D. Ga. 1983).

Yet, like decisions binding in our circuit, the Court in *Grupo* also acknowledged that traditional notions of equity could be expanded or reduced if they came directly from Congress pursuant to its Article I powers.   *See id.* at 333 ("The debate concerning this formidable power over debtors should be conducted and resolved where such issues belong in our democracy: in the Congress."); *see also ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (noting that a federal court's equity powers are "subject . . . to congressional limitation"); *Wirtz v. Jones*, 340 F.2d 901, 903 (5th Cir. 1965) ("[I]n 1949 Congress was persuaded to take away the equity power of the courts to order payment of past due minimum wages or overtime compensation," yet "Congress expressly restored the fully equity powers" years later).

We see no compelling reason (and Escobio cites nothing in support) why a congressional expansion of equitable restitution under the CEA would also not be accompanied with the traditional power of contempt – especially since both legal doctrines are traceable to courts of equity.   Congress is presumed to be aware of a judicial interpretation of a statute and to have knowledge of its effects in connection with historical legal doctrines.   *See Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."). "Because Congress has the power to determine the scope of statutory rights, the proper remedies for statutory violations, and the circumstances under which those

remedies should be available," *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1098 (11th Cir. 2004), it seems evident that the Court's broad equitable power under the CEA (post-*Wilshire*) must include the power of contempt as a necessary tool to enforce the CEA.

### E.  *Reconciling the CEA's Contempt Power with the FDCPA*

Applying the language of these different remedial statutes, we conclude that a plain reading of the text supports Plaintiff's position.  The CEA encompasses broad equitable restitutionary remedies, which remedies the Congress recognized would include all necessary equitable powers, and which would traditionally include the power of contempt.  The CEA clearly did not exclude such a remedy from the operation of the statute and, thus, a money judgment under the CEA that includes a restitutionary remedy may be enforced through the contempt power if necessary. And, because the FDCPA excludes from its umbrella any other federal law that gives rise to a contempt remedy, Escobio cannot defeat Plaintiff's right to seek a contempt remedy based on the FDCPA's general collection provisions.

### 1.  BlueHippo

In fairness, we do not have the benefit of any significant CEA cases, after the 2010 expansion of equitable remedies under the statute, that hold as much. But relevant analogous caselaw does exist.  The Plaintiff in fact heavily relies upon a very recent Southern District of New York case, *BlueHippo Funding*, that was enforcing a similar consumer protection statute. 2017 WL 1162201, at *1-2.  In that case, the Federal Trade Commission filed suit under Section 13(b) of the FTC Act, 15

U.S.C. § 53(b), for alleged violations of federal statutes and regulations.   Section 13 of the FTC Act, like the CEA here, provides the FTC with the authority to seek redress on behalf of injured consumers.   *See FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 605 (9th Cir. 1993) ("Section 13 serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers." (internal quotation marks omitted)).   Specifically, the FTC Act provides that "in proper cases the [FTC] may seek, and after proper proof, the court may issue, a permanent injunction."   15 U.S.C. § 53(b).   After the litigation proceeded, the parties ultimately consented to the entry of a stipulated final judgment, following which the FTC moved for an order to show cause as to why the defendant should not be held in contempt for failing to pay the agreed upon damages.

The defendant, like Escobio here, argued that the court's order – in contrast to an equitable disgorgement order – was merely a "money judgment" and "enforceable only through a writ of execution as per Fed. R. Civ. P. 69(a), or a debt via garnishment, pursuant to the Federal Debt Collection Procedures Act."   *Id*. at *4, n.2.   But, the court rejected that argument and held that the FTC was not limited to the FDCPA because "[c]ontempt sanctions are appropriate 'for the violation of courts' orders to render payment [where] the reliefs are usually the kinds that are traditionally available in equity."   *Id*. at *3 (quoting *Ecopetrol S.A. v. Offshore Exploration & Prod. LLC,* 172 F. Supp. 3d 691, 695 (S.D.N.Y. 2016)).   And, in determining that Section 13(b) was equitable in nature, the court relied upon the

Second Circuit decision's in *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011).

In *Bronson Partners,* the Second Circuit found that "[w]hile the provision's express text refers only to injunctive relief, courts have consistently held that 'the unqualified grant of statutory authority to issue an injunction under [S]ection 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits.'" *Id.* (quoting *FTC v. Gem Merch. Corp.,* 87 F.3d 466, 468 (11th Cir. 1996)); *see also FTC v. Freecom Commc'ns, Inc.,* 401 F.3d 1192, 1202 n. 6 (10th Cir. 2005); *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1102 (9th Cir. 1994); *FTC v. Sec. Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1314–15 (8th Cir. 1991); *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 571–72 (7th Cir. 1989); *FTC v. Sw. Sunsites, Inc.,* 665 F.2d 711, 718 (5th Cir. 1982).   As a result, the Second Circuit held that Section 13(b) allows courts to grant ancillary equitable relief, including equitable monetary relief.   "A money judgment is thus permitted as a form of ancillary relief because, once its equitable jurisdiction has been invoked, 'the court has the power to decide all relevant matters in dispute and to award complete relief.'"   *Bronson Partners, LLC*, 654 F.3d at 366 (quoting *Porter*, 328 U.S. at 399).

*BlueHippo* thus persuasively concluded that, because the monetary consumer redress was a compensatory contempt sanction and ultimately a form of disgorgement, all traditional equitable powers remained intact, notwithstanding the FDCPA.   As the court explained, "the Second Circuit characterized the consumer redress sought *in this action* as a form of disgorgement or equitable restitution, the

recovery of which is available through contempt damages, irrespective of the fact that calculation of the measure of loss in this case 'begins with the defendants' gross receipts derived from such contumacious conduct.'"   *BlueHippo,* 2017 WL 1162201, at *4 (quoting *F.T.C. v. BlueHippo Funding, LLC,* 762 F.3d 238, 245 (2d Cir. 2014) (emphasis in original)).   So, because the relief sought was equitable in nature, the court ruled that the government was not limited by the FDCPA due to the exception in the statute that explicitly allows for the power of contempt "under any Federal law."   28 U.S.C. § 3003(b)(2).

Though this case did not arise under the CEA, it still plainly supports Plaintiff's argument here because "[c]ontempt sanctions are appropriate 'for the violation of courts' orders to render payment [where] the reliefs are usually the kinds that are traditionally available in equity."   *BlueHippo Funding, LLC*, 2017 WL 1162201, at *3 (quotation omitted).   The CEA, which explicitly permits the Plaintiff to pursue relief in the form of equitable restitution, similarly retains all powers available in equity to enforce its provisions.   Hence, like the FTC, the power of contempt remains available to enforce a restitutionary award notwithstanding the general provisions of the FDCPA.

### 2.    *The Eleventh Circuit's Money Judgment Contempt Cases*

Escobio, however, relies on the Eleventh Circuit's decision addressing the contempt power in *Combs*, which is of course binding and far more persuasive for our purposes (assuming it had any direct or even indirect relevance).   *See Combs,* 785 F.2d at 984.   Notably, however, its relevance is quite limited because it arose in a

very different context as it was a civil case between purely private parties that did not at all implicate the FDCPA.[5]   *Combs* upheld the general rule that "when a party fails to satisfy a court-imposed money judgment the appropriate remedy is a writ of execution, not a finding of contempt."   *Id.* at 980 (citing *Shuffler v. Heritage Bank,* 720 F.2d 1141, 1147–48 (9th Cir. 1983); FED. R. CIV. P. 69(a) ("Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise.")).   *Combs,* however, was not enforcing a remedial statute like the CEA that was asserted by the agency tasked with administering the statute.   It was merely enforcing a well-understood principle that remedies at law (involving pure monetary recoveries by private litigants) do not give rise to equitable remedies like the power of contempt.

Significantly, the Eleventh Circuit's analysis in *Combs* distinguished cases like ours.   "A federal court should not . . . enforce a money judgment by contempt or methods [other] than a writ of execution, *except in cases where established principles so warrant.*"   *Id.* (emphasis added; citation omitted).   Thus *Combs* has little bearing here.   First, the case did not involve a judgment obtained by a federal

---

[5]      In *Combs*, the trustees of the United Mine Workers Health and Retirement Funds filed an action under the Employee Retirement Income Security Act ("ERISA") seeking both legal and equitable relief under a collective bargaining agreement.   The parties ultimately agreed upon a consent decree that awarded the trustees a remedy of $492,754.91 to be paid in installments with interest, and injunctive relief preventing asset transcripts apart for valid and fair consideration. The district court retained jurisdiction to monitor compliance and later found that some of the appellants failed to abide by the consent decree.   To enforce compliance with the consent decree, the court incarcerated some of the appellants pursuant to its contempt power.   785 F.2d at 971-73.

agency to vindicate the public interest and obtain restitution for defrauded customers, a case which precisely gives rise to "established principles" that allow for enforcement of equitable remedies by contempt. Second and relatedly, *Combs* did not involve broad equitable remedies like disgorgement or restitution. As the Eleventh Circuit repeatedly emphasized, the case involved only a money judgment (even if characterized as a "consent decree" by the parties) that was only enforceable at law. *Id.*

By contrast, the facts here include (1) a federal agency vindicating defrauded customers, and (2) a statute expressly conferring an equitable remedy. Therefore, the understood principle applied in *Combs* does not help Escobio's cause because equitable restitution under the CEA is *not* simply a money judgment at law.

Although *Combs* lacks direct relevance to the facts presented, the Eleventh Circuit's decision in *United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011), is arguably more analogous. In *Bradley*, three individual defendants and a corporation, owned by two of the defendants, were convicted in a jury trial for crimes related to schemes to defraud the Florida and California Medicaid programs. Specifically, the government prosecuted the individual defendants' schemes "under the anti-racketeering, conspiracy, mail fraud, wire fraud, and money laundering statutes, 18 U.S.C. §§ 1962, 371, 1341, 1343, and 1956, respectively, and the statutes criminalizing the failure to disclose an interest in a financial account in a foreign country while engaging in a pattern of illegal activity, i.e., mail fraud, wire fraud, or money laundering." *Id.* at 1227. As part of their sentences, the court sentenced the

defendants to terms of imprisonment, imposed fines, ordered them to make restitution in the amounts of $27,804,995, $25,461,314, and $3,294,077 respectively, and required them to pay, joint and severally, to the United States a forfeiture sum of $39.5 million on behalf of the victims of the defendants' crimes.

To aid in the collection of the forfeiture sum, the district court appointed a receivership. However, on appeal, the Eleventh Circuit found that the FDCPA provided the government with all the necessary tools to obtain payment of the fines, special assessments, and the $39.5 forfeiture sum without the need for an equitable enforcement mechanism. *Id.* at 1309-10 ("In this case, the judgments at issue imposed in favor of the United States fines totaling $33.1 million, assessments totaling $46,400, and a *money judgment* for $39.5 million.") (emphasis added). As the Eleventh Circuit explained, the government has many avenues to collect payments under the FDCPA without the need of a receivership when the remedies constitute a money judgment:

> Assuming that no payment was forthcoming, all the Government had to do was to identify property the Bradleys and Tellechea owned and utilize the Act's tools. If the Government knew of property these defendants owned, it could seize the property via writs of attachment (for tangible property) and garnishment (for intangible property, like a bank account). If the Government was unaware or uncertain of what the defendants owned, it could (1) depose the Bradleys, Tellechea, and anyone else having knowledge of their assets and (2) obtain any other discovery provided for by the Federal Rules of Civil Procedure or state law. 28 U.S.C. § 3015. These tools are designed for use by all lawyers, including those in the United States Attorney's office.

*Id.*   Given the tools set forth under the FDCPA, the Eleventh Circuit held that the district court abused its discretion in appointing a receivership (an equitable remedy) to aid in the government's collection efforts.   *See id.*

While reviewing the lower court's discretion to appoint a receivership, the Eleventh Circuit further explained that the reason for the reversal was, in part, because the government's approach would eventually run afoul of the rule in *Combs*. The Eleventh Circuit assumed that what the government ultimately had in mind was to eventually seek property from the defendants and hold them in contempt to pursue sanctions under the court's contempt power if they did not comply.   The Eleventh Circuit envisioned the dangers with the government's approach and noted that an implicit consequence of the district court's order would violate *Combs* because the relief at issue, including the forfeiture sum, was a money judgment – not an equitable remedy:

> We assume that what the Government had in mind for this case was something like the following.   The receiver identifies a piece of property, real or tangible, which, she has reason to believe, is owned by one of the Bradleys or Tellechea.   She asks the owner to turn the property over to her, but he refuses.   So, she has the United States Attorney, or a private attorney hired with the district court's permission, move the district court to order the owner to turn over the property or face a *civil contempt sanction*.   The court grants the motion, and the owner complies; if not, the owner is held in contempt and sanctioned.

*Id.* (emphasis added).

Hence, the Eleventh Circuit reversed the district court's order appointing the receivership because "equity intervenes only when there is no remedy at law or the remedy is inadequate."   *Id.* ("At bottom, they are more adequate than the self-help

devices, whatever they might be, that a receiver would have to use. It is for this reason that the court's appointment of a receiver to collect the defendants' fines and special assessments was inappropriate.").   In other words, the district court had no basis to use a form of equitable relief – in that case a receivership – when only money damages were at issue.

As for the restitutionary awards, the Eleventh Circuit held that a receivership was also not required to enforce payments to the victims of the defendants' fraudulent schemes.   The Eleventh Circuit noted that the United States owned one of the defendant corporations and that if it was liquidated, the United States could simply pay the required amounts pursuant to the underlying judgment.   Yet, to the extent the proceeds of the liquidation did not satisfy the $27.8 million; "the court [could] enforce payment to the victims via its contempt power or the revocation or modification of the defendants' terms of supervised release."   *Id*. at 1311. Therefore, the district court abused its discretion with respect to the enforcement of the restitutionary awards because a receivership was unnecessary when both (1) liquidation, and (2) the power of contempt were available as enforcement mechanisms.

Like *Combs*, *Bradley* does not sustain Escobio's position.   In fact, *Bradley* strongly supports Plaintiff's argument because, despite the remedies available under the FDCPA, the Eleventh Circuit determined that the restitutionary awards were still enforceable via a court's contempt power.   That is a *critical* point to emphasize, especially because the case explicitly deals with the collection efforts available to the

government under the FDCPA.  And notwithstanding the FDCPA, the Eleventh Circuit found that restitution, which the Court obviously did not view as a money judgment like the forfeiture sum and subject to the rule in *Combs*, is enforceable via a court's contempt power.  As a result, *Bradley* undermines Plaintiff's argument because, while the Eleventh Circuit indicated that a money judgment is subject to the FDCPA and the rule in *Combs*, the Court only included in its discussion of restitution (which immediately followed the section on the forfeiture sum and the FDCPA) the power of contempt.

Here, the remedy sought is, by statutory command, equitable restitution, not merely an award of compensatory money damages or a forfeiture sum to the United States.  When juxtaposed against the remedies at issue in *Bradley*, Plaintiff's argument to enforce the CEA via the power of contempt is even stronger.  While the types of restitutionary awards in *Bradley* were not explicitly defined as equitable (yet still subject to the power of contempt), the CEA clearly provides for equitable restitution in this case.  Moreover, the restitutionary award in *Bradley* (which sought payment to the United States on behalf of the victims) is akin to the relief sought in this case, where the CFTC seeks to make "whole each and every customer whose funds were received or utilized" by defendants in violation of the CEA.  [D.E. 1].  By contrast, the forfeiture sum that was the primary focus in *Bradley* is more akin to the type of money judgment that Escobio is describing in his motion, which is a very different animal from the restitution judgment that the Court actually entered.  Therefore, there is no persuasive reason why equitable restitution in our

case merits different treatment than *Bradley* did vis-à-vis the availability of contempt for the restitutionary aspect of that judgment.

Plaintiff also cannot argue persuasively that the forfeiture sum in *Bradley*, which the Court undoubtedly construed as a money damage and subject to the rule in *Combs*, is akin to equitable restitution.  The Eleventh Circuit has made clear that forfeiture and restitution are distinct remedies that serve completely different goals. "The goal of restitution is to compensate victims for their losses . . . while the goal of forfeiture is to punish."  *United States v. Rosin*, 263 F. App'x 16, 37 (11th Cir. 2008) (citations omitted); *see also United States v. Davis*, 706 F.3d 1081, 1083 (9th Cir. 2013) ("Forfeiture is imposed as punishment for a crime; restitution makes the victim whole again.") (citation omitted);*United States v. Leahy,* 464 F.3d 773, 793 n.8 (7th Cir. 2006) ("While we recognize to the untrained eye, this might appear to be a 'double dip,' restitution and forfeiture serve different goals . . . .").

And in light of those differences, it is settled law that equitable restitution is subject to the power of contempt whereas "[e]quitable jurisdiction to review a forfeiture is extremely limited and does not lie where the claimant has an adequate remedy at law."  *United States v. Watkins*, 120 F.3d 254, 256 (11th Cir. 1997); *see also In re One 1983 Mercedes Benz Automobile,* 131 F.R.D. 199, 200–01 (M.D. Ala. 1989) (court would not exercise equitable jurisdiction over request for return of car declared forfeited).   These fundamental differences explain why the Eleventh Circuit in *Bradley* construed the forfeiture sum as a "money judgment," subjected the remedy to the rule in *Combs*, and addressed it apart from restitution.  *See Bradley*,

644 F.3d at 1310.   Accordingly, neither *Combs* nor *Bradley* undermine Plaintiff's position under Eleventh Circuit precedent because, despite Escobio's insistence that the relief sought here is a money judgment, it is actually equitable restitution sanctioned under the CEA and susceptible to a court's traditional contempt power.

### 3.   *Relationship Between Disgorgement and Restitution*

Nevertheless, Escobio argues that the FDCPA codified *Comb's* holding by explicitly "provid[ing] the exclusive civil procedures for the United States . . .  to recover a judgment on a debt."   28 U.S.C. § 3001(a).   And because the FDCPA does not explicitly include a post-judgment remedy to enforce a debt by contempt, Escobio concludes that Plaintiff lacks any legal basis to seek an order to show cause to try and hold him in contempt to remedy a money judgment enforceable only through the FDCPA.

Escobio finds support for his position in distinguishing the equitable power cases that the Plaintiff relies upon.   Escobio maintains that many of those cases deal with the remedy of "disgorgement" that is not included in this money judgment.  Again, however, that distinction is not dispositive here.

It is undoubtedly true that disgorgement and restitution are distinct doctrines.   "Disgorgement orders operate to 'wrest[]ill-gotten gains from the hands of a wrongdoer' and are 'more like an injunction for the public interest than a money judgment . . . It is this feature, the similarity to an injunction, that allows disgorgement orders, unlike judgments, to be enforced by civil contempt.'"   *Solow*, 682 F. Supp. 2d 1312, 1324 (S.D. Fla. 2010) (quoting *Steffen v. Gray, Harris &*

*Robinson, P.A.*, 283 F. Supp. 2d 1272, 1282 (M.D. Fla. 2003)).   Plus, while "disgorgement is similar to 'restitution,' a form of debt within the FDCPA definition, there are several significant differences." *MC Asset Recovery, LLC v. South Co.*, 2008 WL 8832805, at *3 (N.D. Ga. July 7, 2008) (citing *SEC v. AMX, Int'l, Inc.,* 7 F.3d 71, 74–75 (5th Cir. 1993)).   Restitution operates to make an injured party whole whereas disgorgement is basically an injunction in the public interest.   "Thus, a disgorgement order might be for an amount more or less than that required to make the victims whole.   It is not restitution." *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993)

Contrasting a distinct restitution award or a civil monetary penalty, Escobio concludes that the FDCPA does not include "disgorgement" in its definition of a "debt" – rendering all of Plaintiff's cases (which purportedly deal solely with that particular remedy) inapposite.   Further, while some parties in the past have tried to argue that disgorgement can be inferred from the statute's definition, Escobio points out that the circuit courts have consistently rejected that approach.   The reason for the rejection is purportedly because disgorgement is not specifically listed in the FDCPA and courts are reluctant to read language into a statute that is otherwise omitted by the drafters.   Hence, Escobio also highlights that Plaintiff does not cite a single case finding that a civil judgment for "penalties" and "restitution" should be excluded from the normal operation of the FDCPA, which would thus bar a contempt remedy for this particular judgment.

Plaintiff takes issue with Defendant's argument because the FDCPA purportedly provides that it shall not be construed in any way to supersede or modify a court's authority to impose injunctive relief or to exercise the power of contempt under any other federal law.  Specifically, Plaintiff relies on the language of the FDCPA that includes an exemption for a court's contempt power: "This chapter shall not be construed to supersede or modify the operation of . . . the authority of a court (A) to impose a sanction under the Federal Rules of Civil Procedure; (B) to appoint a receiver to effectuate its order; or (C) to exercise the power of *contempt* under any Federal law."  28 U.S.C. § 3003(c)(8) (emphasis added).  Because the statute specifically carves out an exemption for remedies subject to the power of contempt, Plaintiff argues that Defendant's argument holds no merit.

In addition to the plain language of the statute, Plaintiff directs the Court's attention to a recent Tenth Circuit decision.  In *United States v. Badger*, the Tenth Circuit, in dicta, touched upon whether disgorgement equates to restitution within the meaning of the FDCPA.  *See* 818 F.3d at 576.  Without settling that debate, the Tenth Circuit noted that even if disgorgement qualified as a "debt" under the FDCPA, the statute "does not limit a federal court's authority with respect to disgorgement injunctions or contempt sanctions," because of the plain language of the statute.  *Id.* at 576, n.5; *see also NLRB v. HH3 Trucking, Inc.,* 755 F.3d 468, 472 (7th Cir. 2014) (holding that the FDCPA's state-law exemptions for pension-fund distributions were not applicable, because under 28 U.S.C. § 3003(c)(8)(C), the statute does not apply in "a proceeding to remedy a contempt of court."); *SEC v.*

*Aragon Capital Advisors, L.L.C.,* 2011 WL 3278907, at *7 (S.D.N.Y. July 26, 2011) (state law exemptions have "no bearing on [Defendant's] obligations pursuant to the Final Judgment" and "cannot save [Defendant] from a finding of contempt").

Yet, Plaintiff's reliance on the three sentences of dicta in *Badger* is not dispositive as it does not necessarily stand for the proposition that Plaintiff advocates. The most one can infer from *Badger* is that the Tenth Circuit does not view the FDCPA as limiting a court's authority for disgorgement injunctions or contempt sanctions that arise under other federal laws. But, the Tenth Circuit noticeably did not define what it meant by contempt sanctions and how that relates to a court's equitable powers. While Plaintiff's reliance on the statutory exemption under the FDCPA is persuasive, Plaintiff's reliance on *Badger* is somewhat overstated because the decision is merely dicta and lacks a detailed analysis of the FDCPA in connection with other federal laws.

### 4.   *The Difference Between Legal and Equitable Restitution*

What is more persuasive is the fact that the FDCPA specifically excludes "the authority of the court . . . to exercise the power of contempt under any Federal law," – in this case, the CEA. 28 U.S.C. § 3003(c). To the extent Defendant suggests that the language of the FDCPA would be meaningless if it exempted restitution, this is not the case given that there are two types of restitution available in our jurisprudence. While equitable restitution is associated with a court's contempt power and therefore meets the exception under the FDCPA, legal restitution is connected with a money judgment. *See FTC v. Direct Mktg. Concepts, Inc.*, 648 F.

Supp. 2d 202, 218 (D. Mass. 2009), *aff'd*, 624 F.3d 1 (1st Cir. 2010) ("The funds given in payment for the product would have long since been commingled with other funds in the defendants' hands, and the consumer would be equivalent to a general creditor owed money damages for a wrong.   The consumer would, in other words, be entitled to legal restitution, not equitable restitution.") (internal citations omitted); Doug Rendleman, *Measurement of Restitution: Coordinating Restitution with Compensatory Damages and Punitive Damages*, 68 Wash. & Lee L. Rev. 973, 991 (2011) ("Legal restitution will lead to a plaintiff's money judgment . . . .").

Understanding the distinction between legal restitution and equitable restitution, and how they relate to the FDCPA, is critical to interpreting the statute. Contrary to Escobio's contentions, an exception for equitable restitution by a court's contempt power does not make the FDCPA meaningless when legal restitution is still available.   A distinction between equitable restitution and legal restitution with respect to the FDCPA simply means that one form of restitution meets the exception for contempt whereas the other (depending on the statute) may not.   As touched upon earlier, the Supreme Court has drawn a specific distinction between legal restitution – "a judgment imposing merely personal liability upon a defendant to pay a sum of money" – and equitable restitution, an action in which the plaintiff seeks to "restore to the plaintiff particular funds or property in the defendant's possession." *Knudson*, 534 U.S. at 213 (quotations omitted); *see also Amschwand v. Spherion Corp.,* 505 F.3d 342, 346 (5th Cir. 2007) ("The crucial distinction between two historical species of restitution is that equitable restitution seeks only to restore

to the plaintiff particular funds or property in the defendant's possession, while legal restitution imposed personal liability for breach of a legal duty.").

The difference between legal and equitable restitution therefore forecloses Escobio's strongest argument that the FDCPA, by its plain language, provides the exclusive mechanism for the United States to recover a judgment on a debt.   While the FDCPA undoubtedly includes "restitution" under the definition of "debt," the statute clearly states that it "shall not be construed to supersede or modify the operation of . . . (7) any Federal law authorizing, or any inherent authority of a court to provide, injunctive relief; [or] (8) the authority of a court . . . (C) to exercise the power of contempt *under any Federal law*."   28 U.S.C. § 3003(c) (emphasis added). When juxtaposed with the CEA and the statutory relief of equitable restitution, this remedy falls within the exception provided under the FDCPA because the remedy is subject to a court's contempt power.   And while equitable restitution meets this exception, legal restitution remains under the ambit of the FDCPA because the latter remedy is not enforceable via the power of contempt.   Therefore, we hold that the FDCPA does not limit another federal law (i.e. the CEA) that provides an equitable remedy susceptible to the power of contempt.

Accordingly, the Court's final judgment that ordered Escobio to pay $2,103,617 in equitable restitution is subject to the power of contempt as an equitable remedy and Plaintiff's Motion on this basis should be **GRANTED**.

**F.** **_Civil Monetary Penalties_**

Next, Plaintiff argues that civil monetary penalties are enforceable via contempt.  Unlike equitable restitution, a civil monetary penalty has long been understood to be a legal remedy because it merely constitutes the exchange of money damages.  *See SEC v. Shavers*, 2014 WL 12622453, at *2 (E.D. Tex. Aug. 26, 2014) ("[T]he Commission is also seeking civil monetary penalties, which are a legal, not equitable remedy"); *SEC v. Kopsky*, 537 F. Supp. 2d 1023, 1026 (E.D. Mo. 2008) ("[P]enalties imposed as a fine rather than mere disgorgement are unquestionably legal remedies"); *United States v. Power Eng'g Co.*, 10 F. Supp. 2d 1145, 1163 (D. Colo. 1998), *aff'd*, 191 F.3d 1224 (10th Cir. 1999) (finding that an "adequate remedy at law" includes "the imposition of civil monetary penalties"); *Ransdell v. Patterson*, 1 App. D.C. 489, 491 (D.C. Cir. 1893) ("[T]he action of debt is the appropriate legal remedy for the recovery of a statutory penalty when no other proceeding is expressly authorized.").

Like money damages, the enforcement of a civil monetary penalty by contempt would this time run afoul of Eleventh Circuit precedent in *Combs* and *Bradley*.   *See Bradley*, 644 F.3d at 1310; *Combs*, 785 F.2d at 980 ("A federal court should not . . . enforce a money judgment by contempt or methods [other] than a writ of execution, except in cases where established principles so warrant.") (citation omitted).   There is also nothing in the CEA to suggest that Congress sought to expand civil monetary

penalties as an equitable remedy, and subject it to the power of contempt.[6]   *See SEC v. Yun*, 208 F. Supp. 2d 1279, 1288 n.22 (M.D. Fla. 2002) ("The Court recognizes that its contempt authority is limited to sanctioning only Yun's failure to pay the disgorgement portion of the judgment against her.   Yun's additional failure to pay the penalty portion of this Court's judgment is governed by the Federal Debt Collection Procedure Act, which precludes a person owing a penalty to the United States from being held in contempt.") (citing 28 U.S.C. § 3002(3)(B)).

The cases that Plaintiff relies upon are also hardly persuasive because they constitute dicta or are devoid of any supporting analysis.   *See, e.g., SEC v. Greenberg*, 105 F. Supp. 3d 1342, 1345 (S.D. Fla. 2015) ("A court may enforce a final judgment of disgorgement, including prejudgment interest and civil penalties, through its contempt power."); *SEC v. Connectajet.com, Inc.*, 2015 WL 6437697, at *2 (N.D. Tex. Oct. 16, 2015) ("[T]he orders for disgorgement and payment of associated interest and civil penalties constitute judgments for specific acts enforceable by contempt sanctions pursuant to Rule 70.").   Because civil monetary penalties are historically a legal remedy and the CEA has not altered that characterization, the

---

[6]    Specifically, "Civil penalties" are not included under the subsection of equitable remedies in the CEA.   *See* 7 U.S.C. § 13a-1(d).   Therefore, Supreme Court precedent directs us to conclude that civil monetary penalties are not an equitable remedy because the usual canon of construction is "that when Congress uses different language in different sections of a statute, it does so intentionally."   *Harbor Gateway Commercial Prop. Owners' Ass'n v. U.S.E.P.A.*, 167 F.3d 602, 606 (D.C. Cir. 1999) (citing *Russello v. United States,* 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quotation omitted); *International Union, UMWA v. MSHA,* 823 F.2d 608, 617–18 (D.C. Cir. 1987)).

Court's contempt power is not available and Plaintiff's Motion on this basis should be Denied.

Yet, simply because Plaintiff cannot enforce the Court's final judgment by contempt for a civil monetary penalty does not mean that Escobio can shirk his obligations.   The FDCPA allows for writs of attachment (for tangible property) or garnishments (for intangible property) as some of the tools to collect outstanding debts.   As such, Plaintiff is entitled to use the tools provided by Congress under the FDCPA to collect the civil monetary penalty.   While the Court's contempt power is not available for this specific relief, Plaintiff has a plethora of tools to enforce the final judgment.   *See Bradley,* 644 F.3d at 1227.

### III.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion is **GRANTED in part** and **DENIED in part**.   Within thirty (30) days of the date of the Court's Order to Show Cause, the Defendant should show why he should not be held in contempt of court for failing to pay the restitution component of the Court's final judgment.   To this extent, Plaintiff's Motion should be **GRANTED**.   As for the enforcement of the civil monetary penalty, Plaintiff's Motion should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the Honorable James Lawrence King, United States District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue

covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 15th day of May, 2017.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge