# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

CASE NO.: 1:14-CV-22739-JLK

U.S. COMMODITY FUTURES TRADING
COMMISSION,

    Plaintiff,

v.

SOUTHERN TRUST METALS, INC.,
LORELEY OVERSEAS CORPORATION,
and ROBERT ESCOBIO,

    Defendants.
_____/

## ORDER FINDING DEFENDANT ROBERT ESCOBIO IN CONTEMPT

THIS MATTER comes before the Court following the Court's Order directing Defendant Robert Escobio to show cause why he should not be held in contempt for failing to comply with the Court's August 29, 2016 Final Judgment, which in part ordered him to pay "restitution in the total amount of $1,543,892 million" (DE 167, at 2). The Court held a two-day hearing on the matter on October 24 and 25, 2018, and has considered the evidence submitted by Defendant Robert Escobio ("Escobio") and Plaintiff Commodity Futures Trading Commission ("CFTC").[1]

## I. BACKGROUND

### A. Factual Background

The United States Court of Appeals for the Eleventh Circuit, in affirming the judgment of the District Court, recapitulated the background of this case as follows:

> Escobio is the Chief Executive Officer (CEO) and largest shareholder of the Southern Trust Securities Holding Corporation (Holding Corporation). The

---

[1] This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

Holding Corporation owns Loreley, a British Virgin Islands corporation, which in turn owns Southern Trust, a Florida corporation. Escobio formed Southern Trust to provide commodities investment services, and he serves as its director and CEO.

Southern Trust represented that it was able to facilitate customers' investment in precious metals. Its website and brochure stated that customers 'can take physical possession of [their] metals in New York or London.' The company's brokers told customers much the same story—that the customers were purchasing metals stored in places like New York, London, and Hong Kong. At least one of Southern Trust's brokers told customers that Southern Trust charged 'storage fees' for the metals. To open a trading account at Southern Trust, customers completed an account-opening form containing language that '[p]hysical precious metals can either be delivered directly to the customer's designated point of delivery or to a recognized depository, which provides insured non-segregated storage.' Southern Trust also represented that it could loan customers money to purchase metals.

But Southern Trust did not in fact deal in metals; it dealt in metals derivatives. Such contracts are a type of derivative investment. Southern Trust, however, was not registered with the CFTC as a futures commission merchant and thus could not trade metals derivatives on registered exchanges. So Escobio, through Loreley, engaged two foreign brokerages—Berkeley Futures Limited and Hantec Markets Limited—to handle the transactions.

Escobio opened trading accounts at Berkeley and Hantec in Loreley's name, not in the names of Southern Trust's customers. The accounts were numbered, and Southern Trust maintained records linking its customers to the specific numbered accounts.

Opening these accounts required Escobio to review documents describing Berkeley's and Hantec's investment products. One of Hantec's account-opening documents, the "Product Disclosure Statement," explains that "bullion trading" "operates in the same manner as foreign exchange trading" in that "[w]hat you are actually buysing is a [c]ontract" that "derives its value from" a "physical underlying asset" such as "Loco London Gold." That document's "Glossary" defines "Loco London Gold" to "mean[] not only that the gold is held in London but also that the price quoted is for delivery there." Elsewhere, the document explains that in "bullion trading," [Hantec] do[es] not deliver the physical underlying assets (i.e. gold or silver) to you, and you have no legal right to it." The Berkeley documents similarly confirm that the account holder intends "to speculate in derivative products." None of the account-opening documents mention making loan for the purchase of metals.

After setting up the trading accounts at Berkeley and Hantec, Southern Trust sent its customers' money to Loreley, which in turn invested the funds, through Berkeley and Hantec, in metal derivatives. Escobio received monthly account statements showing that all investments were in metal derivatives, not metals. Those statements do not reflect any loans to Southern Trust's customers.

Southern Trust never informed its customers that their money was being transferred to Loreley, Berkeley, or Hantec. Nor did it inform customers who wished to invest in metals (the group comprising the vast majority of its customers) that their money was instead being invested in metals derivatives. Southern Trust

2

still charged those customers interest on fictitious loans, which it falsely told them were made in order to facilitate their investment in metals.

After receiving a complaint from one of Southern Trust's customers, the NFA opened an investigation. Around the same time, Escobio asked Berkeley and Hantec about the nature of Loreley's investments. Escobio contended at trial that he did so simply to confirm his understanding that Loreley was investing in metals. The CFTC maintained, however, and the district court ultimately concluded, that Escobio had done so in anticipation of litigation, and that he had carefully framed his inquiries to elicit responses that would support the defense he later asserted— that he did not know that his customers' money was being invested in metals derivatives.

In response to Escobio's inquiry, Hantec's CEO said: "I can confirm that your hold accounts with us that only trade Silver Bullion." Hantec's CEO clarified at his deposition, however, that "Silver Bullion" is industry lingo for derivatives and that he could not have intended any other meaning because trading in "physical metals is not something that Hantec does."

A Berkeley employee similarly responded to Escobio's inquiry, writing that "all Loreley accounts with the prefix XILOR were silver bullion accounts" that "only traded in OTC [off-exchange] silver bullion and never traded any futures contracts." But Berkeley's CEO testified at his deposition that Berkeley had never delivered metals to any of its customers, including Loreley, nor stored any metals on their behalf. He also testified that, despite Escobio's contrary assertion, he never told Escobio that the trades Berkeley handled for Loreley would lead to the storage of metals.

None of Southern Trust's investments led to the delivery of metals. Hantec's CEO testified that he told Escobio that Hantec could arrange for the delivery of metals, but that he did so only in response to a question about a hypothetical situation. According to Hantec's CEO, Escobio inquired in the abstract about Hantec's ability to arrange delivery: "It's an inquiry from a client. Robert [Escobio] did not tell me, 'I would like to deliver metal.' He asked me, 'If I wanted to deliver a metal, can you arrange it?' and I said, 'Let me go find out.'" Hantec's CEO continued: "I talked to . . . one of my contacts at Standard Chartered bank who gave me information and I went back to Robert and explained" that Hantec could arrange delivery. This response was memorialized in a letter to Escobio, stating that "any Gold or Silver you purchase from us is held for your account and upon full payment we are able to arrange delivery for you when requested." But the Defendants never asked Hantec to arrange delivery, and no delivery ever occurred.

The NFA's investigation ended in a settlement. Although the NFA's and the CFTC's investigators had cooperated with each other, their investigations were independent. The Defendants' settlement agreement with the NFA therefore does not mention the CFTC or the CFTC's investigation.

As the CFTC's investigation moved forward, the Defendants continued to produce documents in response to its requests. The Defendants' lawyers knew at the time of the NFA settlement that the CFTC might bring its own enforcement

action, but they did not suggest to the CFTC or to anyone else that such an action would violate their settlement agreement with the NFA.

### B. Procedural Background

In July 2014, the CFTC files its complaint, seeking equitable relief and penalties under the CEA. The complaint alleges that the Defendants engaged in two illegal schemes, which we will refer to as the "unregistered-futures scheme" and the "metals-derivatives scheme."

As to the unregistered-futures scheme, the complaint alleges that, even though the Defendants were not registered as futures commission merchants, they accepted money from customers who wished to invest in futures. Because the Defendants were unregistered, moreover, they could not trade futures on a registered exchange. They therefore sought to trade indirectly, through intermediaries. To that end, the Defendants funneled the customers' money through Loreley to foreign brokerage firms – Berkeley and Hantec – licensed to trade futures. Those brokerage firms made the actual investments.

As to the metal-derivatives scheme, the complaint alleges that the Defendants accepted money from customers who wished to invest in metals with borrowed money. But instead of issuing loans to those customers and investing their money in metals, the Defendants took the customers' money and invested it in metal derivatives. No loans existed, but the Defendants charged loan interest anyway.

At the summary-judgment stage of the case, the parties filed dueling motions. The district court granted the CFTC's motion in part, holding that the Defendants had conducted off-exchange transactions and had failed to register as future commission merchants. It denied the Defendants' motion in full, rejecting their affirmative defenses that (1) their settlement with the FTA equitably estopped the CFTC from bringing suit and (2) they actually delivered metals so as to bring their transactions within an exception to the CEA's registration requirements.

The CFTC's fraud claim then proceeded to trial. After a bench trial, the district court found that the Defendants had engaged in fraud, ordered them to pay restitution in the full amount of the customers' losses, and imposed fines. The court also permanently enjoined the Defendants from employment in the commodities-trading industry. On appeal, the Defendants challenge the court's ruling both on summary judgment and at trial.

*CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1319–20 (11th Cir. 2018).

After granting summary judgment for the CFTC on the issue of Escobio's registration violations, and holding a three-day bench trial, the Court entered findings of fact and conclusions of law that Escobio committed fraud in violation of the Commodity Exchange Act ("Act") and

regulations promulgated by the CFTC (*see* DE 166). On August 29, 2016, the Court entered a final judgment against Escobio and his now-defunct corporate co-defendants (DE 167).

Although Escobio appealed the Final Judgment to the Eleventh Circuit (DE 176), Escobio's motions in the trial court and appellate court to stay the judgment pending appeal were denied (*see* DE 175; DE184). The Eleventh Circuit affirmed the portion of the final judgment that awarded $1,543,892 in restitution for the Defendants' fraud in connection with the leveraged metals scheme (*see* DE 257). *S. Tr. Metals, Inc.*, 894 F.3d at 1332–35.

While Escobio's appeal was pending, the CFTC filed a motion for the Court to issue a rule to show cause why Escobio should not be held in contempt for failing to pay the restitution award entered against him (DE 195). On September 20, 2017, after extensive briefing on this motion, the Court found that Escobio had not complied with the Court's Final Judgment and issued an Order to Show Cause (DE 228). After various motions by Escobio (*see, e.g.*, DE 237), hearing on the matter was held on October 24 and 25, 2018. Escobio paid $3,525 to the restitution fund during this period (10/24/18 Trans. at 15:7-22).

## II. LEGAL STANDARD

Courts have inherent power to enforce compliance with their lawful orders through civil contempt. *SEC v. Solow*, 682 F. Supp. 2d 1312, 1324 (S.D. Fla.) (Middlebrooks, J.), *aff'd*, 396 F. App'x 635 (11th Cir. 2010). A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated a court order. *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (per curiam).

Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor; the alleged contemnor may defend his or her violation on the grounds that it is impossible for the alleged contemnor to comply. *Id.* The burden shifts back to the initiating party only upon a sufficient showing by the alleged contemnor. *Id.*

In order to show that compliance with a court's order was impossible, the alleged contemnor must go beyond a mere assertion of inability, and establish that he or she made "all reasonable efforts" to meet the terms of the court order. *Id.* The "all reasonable efforts" requirement is strictly construed; it is insufficient to show that efforts were merely "substantial," "diligent," or in "good faith." *Id.* Moreover, a defendant's subjective beliefs or intent are irrelevant to the question of contempt. *FTC v. Leshin*, 618 F.3d 1221, 1233 (11th Cir. 2010).

Given these standards, a showing that the defendant was unable to pay the *entire* restitution award is insufficient to avoid contempt; instead, the defendant must show an inability to pay *any portion* of the amount in question. *Accord SEC v. Greenberg*, 105 F. Supp. 3d 1342, 1353 (S.D. Fla. 2015) (Hurley, J.).

### III. ANALYSIS

#### A. Defense Objection to Jurisdiction

Counsel for Escobio argued that the Court lacks jurisdiction to conduct the Rule to Show Cause evidentiary hearing because the mandate had not yet returned from the Eleventh Circuit. This motion is meritless. Counsel does not cite any law for this proposition. It is well settled that a court retains jurisdiction to enforce its orders pending appeal. *See, e.g., King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560, 1563 (Fed. Cir. 1987) (finding a partially vacated damage award enforceable despite remand on a separate portion of relief); *Home Savings of Am., F.S.B. v. United States*, 69 Fed. Cl. 187, 192 (2005) ("In effect, the Federal Circuit severed the case when it remanded, as the only aspect of the case which remains for our disposition is the [portion vacated and remanded].").

6

## B. Defense Contention Final Judgment Not Clear

### 1. Vagueness

Escobio argues that the final judgment was vague and ambiguous, and allowed for partial payment of the restitution award. The final judgment states unequivocally "Defendants shall pay the Restitution Obligation, plus post-judgment interest, within ten (10) days of the date of the entry of this Order" (DE 167, at 3). The Eleventh Circuit, by the opinion rendered July 12, 2018 affirming this Court's Final Judgment, obviously concluded the Judgment was neither vague nor ambiguous. This defense argument is without merit.

### 2. Partial Payment

The provision relating to partial payments states only that the acceptance of partial payment by the CFTC shall not be deemed a waiver of Escobio's obligation to pay the full restitution award (*id.* at 7).

On cross-examination by the defense, Escobio testified as follows:

Q. Now, sir, does the judgment give you an alternative manner of paying back this award?
A. Yes, it does. It includes partial payments and in those partial payments it even includes *de minimis* payments.
. . .
Q. Who told you after the date of this judgment, August 29, 2016, who told you about the partial payments provisions?
A. I hadn't read the full judgment, obviously it was unsettling to read it, but at my deposition the CFTC, and to use their words, "advised and instructed me," to begin making partial payments.
. . .
Q. And if we look at tab B, that's your deposition transcript; is that correct?
A. That's correct.
Q. When were you deposed post-judgment?
A. February 24, 2017.
Q. How long after the final judgment was that?
A. Approximately six months.
. . .
Q. Now, on page 61, line 3, Mr. Konezki, of the CFTC, what did he tell you that led you to believe that you could make partial payments?

7

> A. Mr. Konezki said: "Just to summarize, Mr. Escobio has advised that he will take a look at the final judgment and take steps to start complying with it. In particular, the payments with restitution, civil penalties," and I believe I have done that, I have complied with the final judgment.
>
> . . .
>
> Q. What was your understanding from this exchange . . . ?
> A. Well, it clearly says I would be complying with the judgment if I started making partial payments.
> Q. Did you start making partial payments afterwards?
> A. Yes. I did, and I've continued almost on a monthly basis.
> Q. And we have seen checks that the CFTC has asked you questions about early this morning. If we took a look at tab M, do you recognize these checks?
> A. Yes, I do.
> Q. If you could read it, tell the Court when the first check was that you wrote?
> A. It was a $500 check on March the 8th, 2017.
> Q. And have you continued to make payments after that?
> A. Yes, I have. Almost—I think I may have skipped one month for one reason or another, but I think I've made them almost every month since then.
>
> . . .
>
> Q. And do you have any guidance whatsoever about exactly what amount you're supposed to pay?
> A. Not from the final judgment nor from the CFTC.

(10/24/18 Trans. at 104:15–109:12).

Escobio's testimony is not credible that he relied on statements by a CFTC attorney at a deposition—the opposing party—to determine what would constitute compliance with the Final Judgment. If in doubt, he could have sought advice from his own counsel. Further, the Court finds it unlikely that Escobio could have believed that a *de minimis* payment of $500 constituted good faith compliance with the $1,543,892 restitution judgment.

### C. Escobio's Ability to Pay

It is undisputed that Escobio has not substantially complied with the portion of the final judgment ordering him to pay $1,543,892 in restitution within ten days of the entry of the judgment. Escobio has only paid $3,525 towards his restitution obligation since the entry of the final judgment on August 29, 2016 (10/24/18 Trans. at 15:7-22).

8

Instead, Escobio's primary argument—and the subject of the evidentiary hearing—is that he is unable to pay the restitution award because he lacks the funds to do so. The Court disagrees, and finds that Escobio has failed to demonstrate that he is unable to comply with the Court's order.

The evidence adduced at the hearing shows that Escobio currently has at least $941,447 in assets (Defs.' Ex. C). This figure is taken from a summary exhibit introduced and moved into evidence by Escobio. Escobio's assets include:

- an individual retirement account ("IRA") owned by Escobio worth approximately $300,000;

- a securities investment account co-owned with Escobio's wife, Susan Escobio, as tenants-by-the-entireties, worth approximately $35,000;

- approximately $3,000 in a joint checking account co-owned with Mrs. Escobio, also as tenants-by-the-entireties;

- approximately $554,000 equity in a Florida home co-owned with Mrs. Escobio.

(Defs.' Ex. C; *see also* 10/24/18 Trans. at 109:21–110:12 (IRA); 113:9-20 (securities account); 28:15–28:19 (joint checking account); 29:10-12 (home)). Escobio submits that these assets are "exempt" under state law and should therefore not be considered in determining his ability to pay the restitution award.[2] This is incorrect.

Rather, courts have broad equitable powers to reach assets otherwise protected by state law to satisfy an order for restitution. *See Solow*, 682 F. Supp. 2d at 1325–26 (Middlebrooks, J.) ("[A] district court can ignore state law exemptions as well as other state law limitations on the ability to collect a judgment in fashioning a disgorgement order.").

---

[2] Escobio testified that he has approximately $21,000 in "personal property." (Def.'s Ex. C; 10/24/18 Trans. At 111:16-112:13.) Escobio offers no excuse for why he cannot sell this property to satisfy the judgment.

9

### 1. IRA

To the extent any state law protections exist for Escobio's IRA—and he has not identified any—they are inapposite in contempt proceedings. *See, e.g., FTC v. Leshin*, No. 06-61851-CIV-UU, 2011 WL 617500, at *18 (S.D. Fla. Feb. 15, 2011) (Simonton, M.J.) ("The fact that the individual Defendants were able to place monies in their retirement funds, should not trump their obligation to pay sums due under the Disgorgement Order."), *report and recommendation adopted*, No. 06-61851-CIV-UU, 2011 WL 845065 (S.D. Fla. Mar. 8, 2011); *SEC v. Aragon Capital Advisors, LLC*, No. 07 CIV.919 FM, 2011 WL 3278907, at *7–8 (S.D.N.Y. July 26, 2011) (holding defendant in contempt for failing to turn over IRA, despite state law exemptions). Accordingly, the Court may consider the value of the IRA in determining Escobio's ability to pay.

Since the entry of the judgment, Escobio has withdrawn approximately $250,000 from his IRA, most of which he used to pay legal fees in connection with instant action (10/24/18 Trans. at 19:15–20:6). In so doing, Escobio made a deliberate, conscious choice to pay his own expenses instead of paying the judgment. This is another indication of his state of mind, which is to ignore his obligation to comply with the Court's order. Escobio cannot insulate himself from the restitution order by keeping his assets in an IRA to spend as he chooses. *See Leshin*, 2011 WL 617500, at *18–19.

### 2. Joint Accounts

State law protections applicable to Escobio's jointly-held, tenancy-by-the-entirety securities and checking accounts are likewise inapposite to these contempt proceedings. *See Leshin*, 2011 WL 617500, at *19–20 (Simonton, M.J.) ("[T]he current balances of the bank accounts are not exempt from being used to satisfy the Disgorgement Order based upon their joint-

tenancy nature[.]"). Escobio has the unfettered ability to withdraw money from these accounts, which are used either for savings or to pay household expenses, including Escobio's own expenses (*see* 10/24/18 Trans. at 21:11-17, 25:4–26:10, 28:15-19). Therefore, the funds in Escobio's tenancy-by-the-entirety accounts may be considered in determining his inability to pay.

### 3. Homestead

Escobio has more than $500,000 equity in his Florida home, but argues that it should not be considered in determining his ability to pay by virtue of Florida's "homestead exemption." However, it is well-settled that a court may consider the value of an alleged contemnor's home in determining his ability pay. *See, e.g.*, *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 27 n.29 (D.D.C. 2000) ("The Court is not precluded from considering Bilzerian's homestead in determining his ability to comply with its disgorgement orders") (citing *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 76 (5th Cir. 1993)); *SEC v. Bremont*, No. 96 CIV.8771 LAK, 2003 WL 21398932, at *6 (S.D.N.Y. June 18, 2003) ("The court may consider an alleged contemnor's homestead as well as jointly owned assets in determining his ability to comply with its disgorgement order."). Accordingly, the Court will take Escobio's home equity into account in determining his ability to pay.

### 4. Escobio's Expenses

Escobio has been barred from the financial industry and testified that he makes between $30,000 and $40,000 per year as a pilot.

> Q. Mr. Escobio, who pays for your day-to-day expenses?
> A. I have a small income from my flying. I fly almost every day, sometimes, some weeks seven days a week, I generate income from that. I expect this year to generate somewhere between 30 and $40,000.
> . . .
> Q. Who pays for much of your day-to-day living expenses?
> A. For my personal, day-to-day, my gasoline, my laundry, I pay those myself. Those things that I use, you know, go out and eat lunch, those type of things I pay.

11

(10/24/18 Trans. at 44:18–45:7). Because of this, Escobio claims, he cannot afford more than

$100 per month towards his restitution obligation (*id.* at 16:1-5).

However, Mr. Escobio's testimony on examination by the CFTC reflects:

> Q. Mr. Escobio, what kind of car do you drive?
> A. Presently, I'm driving an SUV, Cadillac SUV.
> Q. What year, please?
> A. I think it's a 2017.
> Q. All right. And where does the money to pay for that come from?
> A. The car's in Susie's name—Susan's name and she pays for it.
> Q. But you drive it?
> A. Sometimes.
> Q. All right. What car does Mrs. Escobio drive?
> A. She drives a Mercedes-Benz, E-300.
> Q. What year, please?
> A. 2017 or 2018.
> Q. All right. Who pays for that one?
> A. Susan.
> Q. All right. Do you have a credit card?
> A. Yes, I do.
> Q. How many credit cards do you have, please?
> A. I think, two or three.
> Q. All right. Who pays those credit cards?
> A. Susan.

(*id.* at 43:5–44:1).

### D. Plaintiff CFTC's Evidence of Discretionary Payments

A forensic analysis conducted by CFTC's investigator, Heather Dasso,[3] testified that from the date of the judgment through June 2018, Escobio and his wife made the following payments:

- $118,700 to attorneys;

- $113,624 to credit cards in the names of the Defendant Escobio, Mrs. Escobio, and the couple's adult daughters;

- $40,076 in student loan payments for the benefit of the adult daughters;

---

[3] The Court found Ms. Dasso's testimony (10/25/18 Trans. at 12–49) to be knowledgeable, logical, and internally consistent.

- $36,548 in car lease payments;
- $31,600 in checks written to cash.[4]

(CFTC Ex. 49; *see also* 10/25/19 Trans. at 21:25–22:18 (describing exhibit)). Escobio testified about his payments toward his adult daughter's student loans:

CRT: How much is the loan that you pay for your daughters, if you—
A. Yes, sir, it's a loan that was taken out, I believe, in 2013 for about $250,000 to pay the tuition for NYU.
Q. And how much per month do you pay or does your household or your wife pay towards these student loans, Mr. Escobio?
A. Precisely, I can't tell you, but I believe it's somewhere between 1,500 and 2,000 a month.

(10/24/18 Trans. 47:15-24). Yet another expense, according to Escobio's testimony, is that since the judgment he has travelled with his wife to Madrid, Spain (several times), the UK, Geneva, Switzerland, and New York (*id.* at 49:2-24).[5]

The Court finds that Escobio's decisions to prioritize all of the above obligations over making payments toward his obligation to the CFTC to be willful evasion of the Court's judgment.

### 1. Mrs. Escobio's Income as President of Southern Trust Securities

Escobio testified that his expenses are paid primarily by income from Mrs. Escobio's job as president of Southern Trust Securities ("STS"). Escobio submits that because Mrs. Escobio is not a party to the judgment, her income from STS should not be considered in ascertaining Escobio's ability to pay. The Court does not agree.

STS is an investment firm founded by Escobio (DE 166, at 20–21). Escobio was its president and largest shareholder until 2014, when industry regulators at the National Futures

---

[4] Escobio pays more than twice as much for Comcast cable as he does to the restitution fund each month (CFTC Ex. 48; *see also* 10/25/18 Trans. at 28:14-20).

[5] On redirect, Escobio changed his testimony about Geneva, to only visiting Spain (10/24/18 Trans. at 119:25–120:8).

13

Association ("NFA") ordered Escobio to give up his shares in the company (10/25/18 Trans. at 54:10-17, 60:18–63:11). Escobio transferred his shares gratis to Mrs. Escobio, who assumed Escobio's position—and salary—as president of STS (*id.* at 54:10-17, 60:18–63:11). This position and resulting salary were paid to Mrs. Escobio as the sole owner of all outstanding stock.

Escobio enjoys the benefits of Mrs. Escobio's $250,000 a-year-plus salary as president of STS (*see* CFTC. Ex. 50; *see also* 10/25/18 Trans. at 18:14–19:4, 21:12-24 (explaining exhibit)). As already mentioned, Mrs. Escobio pays Escobio's automobile lease, his credit cards, and Escobio's share of the household expenses (10/24/18 Trans. at 43:5-20 (car payments), 43:21–44:1 (credit cards), 45:4-9 (household expenses)). Mrs. Escobio uses her salary to subsidize the couple's adult children, paying their car payments, credit card bills, and monthly student loan obligations (*id.* at 47:3-24 (student loans), 47:25–48:9 (car payments), 48:10-15 (credit cards)).

On cross-examination by the defense, Escobio elaborated on the trips with his wife he had made post-judgment:

> Q. We talked about trips, vacations that you took. You mentioned Madrid or the UK. Were these family vacations?
> A. No, and I want to make a correction. The trips were all to Madrid and they were all business-related. Susan has substantial clients in Madrid and a failure to go there and try to either keep the account or add additional accounts, if she doesn't go, she's not going to be able to get those accounts or keep those accounts, so these are all business-related trips.
> Q. These weren't trips you took to have a good time, were they?
> A. No, they were of very short duration, they're quick and basically we have breakfast, lunch and dinner with customers, one after the other, and most of the time they invite us because they know we have made the long journey over, but this is work, no one's out, you know, shopping or having a good time or sightseeing.
> Q. And how long have you been taking these trips, just since the judgment?
> A. No, *I have been doing it for 40 years since I've been in the action, I've had international business, since its inception.*

(*id.* at 119:25–120:21) (emphasis added).

14

The Court finds that this testimony corroborates that STS, despite its change of president and shares from Escobio to Mrs. Escobio following the NFA's 2014 order, continues to operate and benefit Escobio in the same way it did before the NFA's 2014 order. Therefore, the Court finds that Escobio's testimony that his income consists solely of the $30,000 to $40,000 he makes per year as a pilot is inaccurate.

Likewise, the principles of equity do not permit Escobio to enjoy the benefits of Mrs. Escobio's substantial income while pleading poverty in the face of his restitution obligation. Mrs. Escobio's income as president of STS is directly attributable to Escobio's transfer of his shares (and title) to her. Accordingly, Mrs. Escobio's income from STS will be considered in determining Escobio's ability to pay the judgment. *See Solow*, 682 F. Supp. 2d at 1330 (Middlebrooks, J.)

> ("[T]he Solows' accumulated wealth has been derived exclusively from income earned by Mr. Solow. If Mr. Solow cannot convince his spouse to return his assets to him, that is a problem of his own making and he is consequently in contempt of court."); *Leshin*, 2011 WL 617500, at *17 (Simonton, M.J.) ("[T]he $3,000 that Mr. Leshin gives to Mrs. Leshin each month is not protected . . . because the funds are actually an extension of the compensation that Mr. Leshin receives from the Corporate Contempt Defendants.").

### 2. Escobio's Additional Assets

In addition, the uncontroverted testimony of the CFTC's investigator Heather Dasso shows that Escobio received deposits of at least $209,129 from unidentified sources (CFTC Ex. 51; 10/25/18 Trans. at 14:2–15:15, 16:20-23). On direct examination by the CFTC, Escobio testified as follows:

> CRT: You're referring to a $30,000 deposit in December and January of '17 and '18 at . . . TD Bank, and sir, do you recollect, and you may have answered this, whether you made that deposit or someone else did?
> A. Sir, I do recognize that we did make a deposit sometime towards the latter part of 2017, early 2018. We had borrowed money from multiple sources. In addition to credit cards, there were family loans, there were loans from friends. You know, we were in—I was in a very difficult position, I needed to pay legal fees and I borrowed money. I can't specifically tell you who in particular lent me that money, I've got maybe 20, 25 loans outstanding.

15

. . .

Q. So the people you borrowed this money from, what are some of their names?

. . .

A. I borrowed from my family, multiple members of my family.
Q. What are their names, please?
A. My sister, Sonny O'Donnell.
Q. Who else, please?
A. My father, Robert Escobio.
Q. Who else, please?
A. Friends and colleagues from Argentina that we borrowed money back and forth for years.

. . .

Q. Who else, please?
A. Just multiple sources down there. They owed me money and, you know, I've paid—and they've lent me money and we will lend each other back and forth, you know, hundreds of thousands of dollars over the years.

. . .

Q. How much did you borrow since the judgment from your friends and colleagues in Argentina?
A. Probably about $150,000.
Q. All right. Are there any securities or promissory notes or anything you signed to memorialize these debts?
A. On some of them there are, on some of them there are not. It was done on a handshake.

. . .

Q. Do you intend to pay those loans to your friends and colleagues in Argentina?
A. Well, I hope to put this behind me and pay this judgment off and get on with my life and start making money again, clean up my reputation. I look forward to doing business in other sectors than obviously the securities and commodity business and it is my belief that I will, in the future, be able to pay it off.
Q. Have you asked any of your friends or colleagues in Argentina to borrow money to pay off the judgment?
A. Not to my knowledge.

. . .

Q. Mr. Escobio, we were talking before the break about loans from certain persons in Argentina, what are the names of those persons, please?
A. You mean particular—most of the loans were from corporations. Corporations that I've worked with in the past, and not necessarily individuals, but there have been some individuals in the past.
Q. What were the names of the individuals, please?
A. Marcello Fiori, Oscar Cerudi, Antonio Ortisora, Maria Alsonso. It's just a multiple people, I just—I'm just talking off the top of my head. I'm sure I'm forgetting some but...

16

| | |
|---|---|
| . . . | |
| Q. | What are the names of the corporations that you borrowed money from? |
| A. | *I borrowed money* from Santa Pacina, *I borrowed money* from Pro Benefit, *I borrowed money* from Southern Trust Services, *I borrowed money* from Euro Major, just a list of multiple places. |
| Q. | All right. And for which of those corporations do you have loan agreements or promissory notes or anything like that? |
| . . . | |
| CRT: | The question really is do you have any promissory notes from any of those corporations . . . Please answer that. |
| A. | Yes, I do. I think I have, for certain, I have two that I can remember. |
| Q. | All right. Two, and did you produce those to the CFTC. |
| A. | I don't remember if I did or not. I believe I did. |
| Q. | All right. So those two promissory notes, how much are they for? |
| A. | One was for a hundred thousand, it was a revolving promissory note. And the other one was for 50,000. And I think there was a third one, but I'm not certain if we went ahead and got it in writing. |
| Q. | All right. How about for these individuals that you borrowed from, any contracts or loan agreements for them? |
| A. | No, there's probably about 20, 25 individuals and other corporations and no, I did not. |

(10/24/18 Trans. at 54:17–58:17; 74:14–76:5) (emphasis added). The Court does not credit Escobio's testimony that the funds he received are loans he took out post-judgment. Escobio did not introduce into evidence contracts or promissory notes reflecting repayment terms for these loans, although he testified there were "two that [he] can remember" memorialized in writing. Escobio did not produce for the record a description of any of the specific loans (*e.g.*, the amount, the source, the date it was incurred).

On redirect examination, the CFTC elicited the following testimony from Escobio:

| | |
|---|---|
| Q. | How much money did Euro Major loan you after the judgment is my question. |
| A. | It was 20, 25,000. |
| Q. | All right. What about—I'm going to screw this up—Santa Pacina? |
| A. | Santa Pacina has probably lent me about a hundred thousand. |
| Q. | All right. **And prior to the judgment, what did Santa Pacina owe you personally?** |
| A. | **Me personally, nothing.** |
| . . . | |

17

> Q. Did Pro Benefits or any of their subsidiaries or affiliates owe you any money before the judgments?
> A. Yes, they have.
> Q. How much did they owe you before the judgments?
> A. I can't tell you off—**me personally, nobody owes me personally**.

(*id.* at 128:24–130:8) (emphasis added). Therefore, even if loans from corporations were taken out by "Southern Trust entities" prior to the judgment, and not by Escobio individually as his testimony on direct examination suggests, his testimony is that reimbursement for those loans was nevertheless used for his own individual benefit after the judgment, including to pay legal fees, and not for STS business expenses.

Accordingly, the Court will consider the $200,000 to $300,000 Escobio received in determining his whether he should be held in contempt for failure to comply with the judgment. *See CFTC v. Trinity Fin. Grp., Inc.*, No. 92-6832-CIV-UU, 2003 WL 21349668, at *6 (S.D. Fla. Apr. 21, 2003) (contempt where defendant failed to pay judgment but "[s]ubstantial funds have been made available from outside sources (defendant's wife, family members, etc.)").

## IV. CONCLUSION

Escobio has failed to demonstrate that he is unable to pay the restitution ordered by the Court.[6] The evidence shows that Escobio has more than $900,000 in assets, and that since the judgment he has benefitted from a household income of around $250,000 a year, plus the $200,000 to $300,000 in purported "loans." (Def. Ex. C; CFTC Ex. 50). In light of these facts, Escobio's payments totaling $3,525 do not constitute good faith compliance with the final judgment. Not only that, the evidence shows that Escobio does not intend to comply with the Court's restitution order and has deliberately and contemptuously refused to do so.

---

[6] The Court's August 29, 2016 Final Judgment also ordered Escobio to pay $559,725 in restitution, although that portion of the judgment has since been reversed by the Eleventh Circuit, with instructions on remand for this Court to consider "other equitable remedies."

18

Therefore, it is ORDERED, ADJUDGED and DECREED that the U.S. Commodity Futures Trading Commission's Motion for Order to Show Cause Why Robert Escobio should not be held in contempt for violating this Court's Final Judgment **(D.E. #195)** is **GRANTED IN PART**.

It is further ORDERED, ADJUDGED and DECREED that Robert Escobio will be, and he is hereby held in civil contempt of court for violating said judgment.

It is further ORDERED, ADJUDGED and DECREED that the Defendant Robert Escobio be, and he is hereby ordered to pay the sum of $350,000 to the U.S. Commodity Futures Trading Commission within ten (10) days of the entry of this order, or be subject to coercive sanctions. Defendant Escobio is hereby further ordered to make payments of the balance of the restitution award, at the rate of $10,000 per month until fully paid, or face coercive sanctions, which shall issue on motion by the CFTC.

It is further ORDERED AND ADJUDGED that should Robert Escobio not pay the sums identified above within ten (10) days of the issuance of this Order, upon written notice from the CFTC of the infringing Defendant's non-compliance, a warrant for his arrest shall issue and the United States Marshal Service is authorized to take Escobio into custody and incarcerated until such time as he fully complies with this Court's Order.

Upon notification from the U.S. Marshal's Office that Escobio is in custody, this Court will hold an immediate hearing to consider such motions as the Defendant may wish to have heard regarding his failure to comply, assertion of appellate applications or requests, or any other relevant issue. This sanction is coercive and not for punitive or punishment purposes.

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida this __18__ day of March, 2019.

*James Lawrence King*
JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc: **All Counsel of Record**